BORG WARNER INTERNATIONAL CORPORATION, demandante y recurrida, *v.* QUASAR COMPANY, A DIVISION OF MATSUSHITA ELECTRIC CORPORATION OF AMERICA, ETC., demandadas y peticionarias.

*Número:* CE-94-182 *Resuelto:* 14 de marzo de 1995

*Samuel T. Céspedes* y *Ana Matilde Nin*, de *McConnell & Valdés*, abogados de las peticionarias; *A.J. Bennazar Zequeira*, de *González, Bennazar, García-Arregui & Fullana*, abogado de la recurrida.

El Juez Asociado Señor Fuster Berlingeri emitió la opinión del Tribunal.

Tenemos, otra vez, ante nos una situación novel relacionada con la Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278 *et seq.*, conocida como la Ley sobre Contratos de Distribución (en adelante Ley 75). Nos toca hoy dirimir otra compleja controversia sobre el alcance del concepto "justa causa" en situaciones en que un principal se retira del mercado puertorriqueño, y determinar si a la luz de los criterios emitidos en *Medina & Medina v. Country Pride Foods*, 122 D.P.R. 172 (1988), la decisión de retirarse del mercado fue de buena fe. El recurso nos permite ampliar los pronunciamientos sobre el particular emitidos en nuestra decisión anterior.

## I

La demandante Borg Wagner International, Corp. (en adelante BWAC)[1] es una empresa mercantil independiente cuya actividad principal consiste en proporcionar

---

[1] La corporación matriz de Borg Wagner International, Corp. (BWAC) era Borg Wagner Financial Service, vendida con posterioridad a Transamerica Commercial Finance Corporation.

financiamiento al público consumidor para la compra de muebles y enseres del hogar a través de contratos de venta condicional. La codemandada Quasar Company (en adelante Quasar), división corporativa de Matsushita Electric Corporation of America (en adelante MECA), es el distribuidor general de productos marca Quasar en Estados Unidos; no manufactura producto alguno.

BWAC y Quasar entablaron, a finales de 1982, una relación de naturaleza contractual para la venta y distribución de los productos marca Quasar en Puerto Rico. Conforme con ésta, Quasar era el principal y BWAC el distribuidor en Puerto Rico de dichos productos. A pesar de no constar por escrito, el intercambio comercial entre ambas compañías reunía los requisitos necesarios para configurar un contrato entre las partes, a saber: consentimiento, objeto y causa. Conforme con dicha relación contractual, la demandante compraba sobre el 90% del total de los productos marca Quasar que la codemandada Quasar vendía en Puerto Rico. El remanente porcentual era vendido por Ernesto Ruiz, Inc., una cadena de tiendas de menor escala que la de la demandante.

La demandante —individual e independientemente— creó, desarrolló y coordinó un mercado favorable para los productos citados en el mercado puertorriqueño. BWAC adquiría los productos directamente de Quasar(2) y los vendía al detal a los consumidores del país, a través de sus 17 tiendas en la Isla.

En 1986, por razón de que la industria de productos electrónicos experimentaba una baja en su demanda, MECA tuvo que reorganizar drásticamente el sistema de distribución de Quasar.(3) A raíz de esto, MECA decidió

---

(2) Quasar Company (en adelante Quasar) operaba en Estados Unidos a través de zonas. Durante el período comprendido entre 1982 y 1986, la división de la zona sureste de dicha corporación se ocupaba de distribuir los productos a Puerto Rico.

(3) Como parte de dicha reorganización, Matsushita Electric Corporation of America (en adelante MECA) cerró las oficinas y almacenes de Quasar en Miami para consolidarlas con las de Atlanta y realizó despidos masivos. BWAC tenía cono-

transferir la distribución general de los productos Quasar en Puerto Rico a Panasonic Sales Company (en adelante Panasonic), división corporativa de la codemandada Matsushita Electric of Puerto Rico (en adelante MEP), una afiliada de MECA. Panasonic se dedica a la distribución general de los enseres eléctricos marca Panasonic y Technics a través de una red de detallistas; tampoco manufactura producto alguno. MECA y MEP son subsidiarias de Matsushita Industrial Company, Ltd. de Japón.

Con la transferencia referida, MECA pretendía que, efectivo el 1ro de abril de 1987, BWAC, en lugar de tramitar y recibir las órdenes y los productos en cuestión directamente de Quasar, tramitara las órdenes y recibiera los productos de Panasonic, división de MEP, su afiliada en Puerto Rico. Desde el primer momento BWAC objetó a la transferencia. Ello no obstante, representantes de BWAC y de Panasonic se reunieron en Puerto Rico en dos ocasiones como parte de un proceso de negociación para acordar los términos de la nueva relación revisada entre BWAC y Panasonic. Posteriormente, BWAC abandonó las negociaciones y le exigió a Quasar que la restituyera a la relación original entre ellas, solicitud que Quasar denegó. Panasonic entonces le remitió por escrito a BWAC su oferta final para que continuaran las relaciones comerciales entre ellas, pero BWAC nunca contestó. No obstante, Panasonic tramitó una primera orden de los productos Quasar e intentó vendérselos a BWAC, que se negó a adquirirlos. Así las cosas, BWAC no volvió a comprar productos Quasar, ni MECA ni MEP volvieron a venderlos en Puerto Rico.

Con motivo de estos hechos, el 8 de marzo de 1988, BWAC presentó una demanda de daños y perjuicios por incumplimiento de contrato y por interferencia torticera

---

cimiento de esto, ya que recibió productos de Atlanta y contrató a uno de estos empleados despedidos. Se trata de Gabriel Villani, quien fue empleado de Quasar durante aproximadamente catorce años hasta que fue cesanteado en 1986 cuando era Gerente General para la zona sureste. Eventualmente fue nombrado Vicepresidente Ejecutivo de BWAC.

contra MECA/Quasar y MEP/Panasonic. En ésta alegó, en síntesis, que Quasar terminó la relación comercial existente con BWAC de forma unilateral y sin justa causa y que dicha actuación había constituido un acto torticero indemnizable bajo la Ley 75. Alegó, además, que al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141,[4] MEP le debía indemnizar también por haber menoscabado e interferido ilegalmente con las relaciones contractuales entre BWAC y Quasar. Arguyó la demandante que estas actuaciones de las demandadas le ocasionaron —y le continuaban ocasionando— graves daños económicos.[5]

Las demandadas contestaron la demanda y, entre sus defensas afirmativas, plantearon que la reclamación contra MEP estaba prescrita; que si la demandante había sufrido daños fue como resultado de sus propias actuaciones; que la demandante no puede ir en contra de sus propios actos, puesto que, desde antes de conocer acerca de la transferencia entre las demandadas, BWAC había reducido sustancialmente la compra de los productos Quasar, y fue BWAC quien abandonó totalmente la línea Quasar. En la alternativa, alegaron que BWAC no sufrió daños porque, luego de la alegada terminación de la relación, sus ventas superaron las ventas de los años anteriores.

Posteriormente, las demandadas también señalaron que luego de haber fracasado las negociaciones de buena fe entre las partes, Quasar se retiró por completo del mercado puertorriqueño, lo que constituyó justa causa para terminar la relación contractual. Por último, argumentaron que MEP no interfirió culposamente con la relación contractual

---

[4] El Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141 dispone, en lo pertinente, que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". A su vez, nuestra jurisprudencia ha reconocido que el Art. 1802 del Código Civil de Puerto Rico, *supra*, permite la acción por interferencia culposa con las obligaciones contractuales de terceros. *Gen. Office Prods. v. A.M. Capen's Sons*, 115 D.P.R. 553 (1984).

[5] En la demanda, BWAC también alegó conspiración entre Quasar y Panasonic Sales Company (en adelante Panasonic) para privar a BWAC de sus derechos contractuales. Posteriormente, desistió de esta alegación.

habida entre BWAC y Quasar, sino que lo ocurrido constituyó una sustitución de principal de MEP por su afiliada MECA a través de su división Panasonic.

Para facilitar los procedimientos, el tribunal de instancia separó la acción en tres controversias independientes. La primera de ellas requería determinar si la relación establecida entre BWAC y Quasar desde 1982 hasta 1987 estaba cubierta por la Ley 75.

Mediante sentencia sumaria parcial, el 18 de enero de 1991 el foro de instancia determinó que BWAC era, en efecto, un distribuidor típico bajo la Ley 75. Las demandadas, inconformes, recurrieron ante nos. Mediante Resolución de 20 de marzo de 1991 denegamos el recurso solicitado en esa etapa de los procedimientos.

Luego de varios incidentes procesales, el 31 de enero de 1994 el tribunal de instancia emitió su segunda sentencia parcial. En ella dispuso de las restantes dos controversias y determinó que Quasar había puesto fin a la relación de distribución con BWAC sin justa causa y que MEP había interferido culposamente con la relación contractual establecida entre Quasar y BWAC, lo que le causó daños a esta última. Inconformes con el dictamen emitido, las demandadas oportunamente recurrieron ante nos y, en esencia, plantearon: (1) que procedía la revocación de la sentencia dictada en su contra por entender que el tribunal de instancia erró al determinar que BWAC era un distribuidor cobijado bajo la Ley 75; (2) que Quasar terminó el contrato sin justa causa, y (3) que el tribunal erró al determinar que le asistía a la demandante una causa de acción por interferencia torticera contra MEP y que tal acción no estaba prescrita.

El 16 de mayo de 1994 le concedimos treinta días a la parte recurrida para que mostrara causa por la cual no debíamos expedir el auto y revocar la sentencia dictada por el Tribunal Superior, Sala de Carolina, sólo en cuanto su determinación de que las circunstancias del caso no cons-

tituyeron un retiro total del mercado permitido por la Ley 75, y en cuanto a la determinación de que MEP era un tercero a los fines de la alegación de interferencia, y que la acción en su contra no estaba prescrita.

Habiendo comparecido la parte recurrida, nos encontramos en posición de resolver y lo hacemos según lo intimado.

## II

■ La Ley 75 crea una causa de acción a favor del distribuidor cuando el principal da por terminado el contrato sin justa causa. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 77 (1983).([6]) El Art. 1(d) de la referida ley define justa causa como el "incumplimiento de alguna de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios". 10 L.P.R.A. sec. 278(d). Véase *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 399 (1973).

■ Ante el silencio del legislador sobre ciertos aspectos sensitivos del esquema de la Ley 75, en ocasiones este Tribunal ha tenido que resolver las lagunas del estatuto.([7]) Así, en *Medina & Medina v. Country Pride Foods*, supra, resolvimos que en los casos en los cuales haya un contrato de plazo indefinido con precios y términos de crédito que se hayan dejado abiertos a la negociación, la Ley 75 no prohíbe que el principal se retire totalmente del

---

([6]) Véase, además, P. Salamone, *Puerto Rico's Distributor's Law: Law 75: A Primer*, 18 Rev. Jur. U.I.A. 67, 103 (1983).

([7]) Véanse: *Medina & Medina v. Country Pride Foods*, 122 D.P.R. 172 (1988); *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, 122 D.P.R. 115 (1988); *Pacheco v. Nat'l Western Life Ins. Co.*, 122 D.P.R. 55 (1988); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *San Juan Merc. v. Canadian Transport Co.*, 108 D.P.R. 211 (1978); *J. Soler Motors v. Kaiser Jeep Int'l*, 108 D.P.R. 134 (1978).

mercado de Puerto Rico, siempre y cuando ese principal no haya intentado apropiarse de la plusvalía o la clientela establecida fruto de la actividad del distribuidor. Dicho retiro debe ser el resultado de que las partes, aun cuando negociaron de buena fe, no pudieron llegar a un acuerdo en cuanto al precio, crédito o algún otro elemento esencial del contrato de distribución, y debe estar precedido por un plazo de preaviso, que dependerá de la naturaleza de la concesión, de las características de la empresa distribuidora *y de la naturaleza de los tratos que anteceden a la ruptura del contrato.* Dijimos en aquella ocasión, además, que tal abandono total del mercado constituye justa causa para dar por terminada la relación.

Consignada la norma, ahora nos toca resolver en el caso ante nuestra consideración si la codemandada Quasar en efecto se retiró del mercado puertorriqueño y, de ser así, si dicho retiro constituyó justa causa para terminar su relación con BWAC bajo la Ley 75. A estos fines, es menester examinar si Quasar cumplió con cada uno de los requisitos esbozados en *Medina & Medina v. Country Pride Foods,* supra, para que prospere la defensa de retiro del mercado. Evaluémoslos, pues, por separado. Comencemos por determinar si, como cuestión de hecho, Quasar efectivamente se retiró del mercado puertorriqueño. Veamos.

## A. *Retiro del mercado*

Surge de los autos del caso que como parte del plan de reorganización del sistema de distribución de los productos Quasar en Puerto Rico, las demandadas Quasar y MEP intentaron continuar una relación revisada con BWAC. BWAC, sin embargo, abandonó las negociaciones sobre el particular y exigió que se mantuviera inalterada la relación original que tenía con Quasar. Una vez fracasadas las negociaciones entre las partes, BWAC no volvió a comprar productos Quasar y *ninguna de las demandadas volvió a*

*venderlos en Puerto Rico.* Las recurrentes alegan que esto constituyó un retiro total del mercado de Puerto Rico.

En su comparecencia en cumplimiento de una orden para mostrar causa, BWAC argumenta que no hubo tal retiro *total* del mercado puesto que, como cuestión de hecho, los productos Quasar han continuado vendiéndose ininterrumpidamente en Puerto Rico, aunque reconocen que en una escala muchísimo menor que cuando eran distribuidos por BWAC.

Arguye la recurrida que la prueba que tuvo ante sí el tribunal de instancia, en lo relativo a la presencia de Quasar en Puerto Rico, era suficiente para demostrar que la recurrente no se había retirado totalmente del mercado. Esta prueba consistió en el testimonio que un consumidor vertió en el juicio, a los efectos de que había adquirido un televisor usado marca Quasar mediante un contrato de alquiler con opción a compra en un negocio de nombre Vista Center. Vista Center es una cadena nacional en Estados Unidos y Puerto Rico dedicada al alquiler de enseres electrónicos.

Nos plantea la recurrida que el testimonio de un solo consumidor es suficiente para establecer que las demandadas no se han retirado totalmente del mercado puertorriqueño, pues entiende que "[p]ara muestra un botón basta". No estamos de acuerdo. El testimonio en cuestión, por sí solo, no es suficiente para probar, a los fines de este caso, la alegación de la recurrida. Lo que está planteado jurídicamente es si alguna de las demandadas, aprovechándose del mercado desarrollado por la demandante, ha continuado vendiendo los productos Quasar en Puerto Rico, de modo tal que deba concluirse que el principal no ha abandonado totalmente el mercado de la Isla. Para resolver este asunto es necesario traer a colación la actividad comercial *de las demandadas* en lo que respecta a la venta continuada de productos Quasar en la Isla. No basta, como prueba, la venta aislada de un solo producto Quasar, máxime cuando

el consumidor aludido testificó que el televisor que adquirió era *usado,* motivo suficiente para suponer que Vista Center no lo adquirió directamente de Quasar o una de sus afiliadas, sino a través de alguno de sus clientes en Puerto Rico o en Estados Unidos.

Los autos ante nos están huérfanos de prueba adicional que efectivamente demuestre la venta continuada de productos Quasar en Puerto Rico por parte de las demandadas, por lo que debemos rechazar esta parte de los planteamientos de la recurrida.

Alega BWAC que tampoco puede considerarse que Quasar se retiró totalmente del mercado, ya que la recurrente nunca tuvo la intención "espontánea y sincera" de hacerlo. Según la recurrida, jurídicamente no puede considerarse que el principal ha abandonado el mercado si no surge con claridad que tuvo la intención original de hacerlo.

No cabe duda de que la intención del principal puede ser un asunto pertinente en casos de retiro del mercado. Ello es así, por ejemplo, cuando el principal se valga de subterfugios o de fraude para enviar o permitir que se envíe su mercancía por canales indirectos a Puerto Rico, o cuando utilice el mecanismo del retiro de la zona geográfica como pretexto para circunvalar la acción remedial del estatuto. *Medina & Medina v. Country Pride Foods,* supra, pág. 190 esc. 5. Se trata de situaciones en las que, en efecto, el retiro del mercado se hace de mala fe. La intención del principal, pues, es pertinente únicamente para demostrar su mala fe al abandonar el mercado. Ante el cuadro fáctico que atendemos en el caso de marras, tenemos que concluir que Quasar, en efecto, se retiró del mercado puertorriqueño. Veamos, entonces, si en dicho retiro medió la buena fe o no de las demandadas recurrentes.[8]

---

[8] En el derecho puertorriqueño, de ordinario, se presume la buena fe, *Citibank v. Dependable Ins. Co., Inc.*, 121 D.P.R. 503 (1988); por lo que corresponde probar la mala fe al que la reclama, *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 351 (1984). En casos de la Ley Núm. 75 de 24 de junio de 1964, según enmen-

## B. *Negociación de buena fe*

Surge del expediente ante nos que en dos ocasiones diferentes, representantes de BWAC y Panasonic se sentaron a negociar para intentar la continuación de las relaciones comerciales preexistentes, de manera revisada. En la primera de estas reuniones, el 24 de febrero de 1987, funcionarios de Panasonic le presentaron los planes de su compañía a los representantes de BWAC. En la segunda reunión, el 5 de marzo de 1987, las partes aludidas se circunscribieron a la discusión de los nuevos términos de la relación, y suscintamente a la discusión de precios sugeridos y de la exclusividad en ciertos modelos. Panasonic le remitió por escrito a BWAC los términos y las condiciones finales en discusión, mediante Carta de 7 de abril de 1987. BWAC nunca contestó esta carta; *tampoco hizo una contra-oferta ni intentó una comunicación adicional con Panasonic.*

El 12 de marzo de 1987 BWAC había escrito a Quasar. Le informó que no había podido llegar a un acuerdo con Panasonic, por lo que solicitaba que se le restituyese a una relación directa y exclusiva con Quasar. Amenazaba, por primera vez, con tomar acción legal bajo la Ley 75.

▇ Como intimamos en *Medina & Medina v. Country Pride Foods*, supra, para que la negociación efectuada por el principal pueda ser considerada de buena fe, es indispensable que los términos que éste ofrezca al distribuidor sean razonables. Lo verdaderamente medular para determinar si una negociación ha sido *bona-fide* es que se haya colocado al distribuidor ante una opción real, que sea susceptible de considerarse o discutirse. Es obvio que sería un ejercicio fútil o engañoso convocar a reuniones y sentarse a

---

dada, 10 L.P.R.A. sec. 278 *et seq*. (en adelante Ley 75), establecido el retiro total del mercado del principal, corresponde al distribuidor el peso de probar la mala fe de éste. S. Antonetti Zequeira, *La medida de los daños bajo la Ley 75*, 58 Rev Jur. U.P.R. 227, 237 (1989), citando a *Medina & Medina v. Country Pride Foods, Ltd.*, 825 F.2d 1 (1er Cir. 1987).

negociar, si lo que se le ofrece al distribuidor es una alternativa de cambio que no tiene visos de viabilidad, que es irrisoria o que constituye una oferta de nuevos términos y condiciones, tan drástica que en el curso ordinario de los negocios no le deja al distribuidor otra alternativa real que no sea la de rechazar de plano la oferta en cuestión.[9]

Hemos examinado los términos del contrato original entre BWAC y Quasar y los hemos comparado con los nuevos términos y condiciones que Panasonic le ofreció a BWAC con este principio fundamental en mente, luego de lo cual concluimos que los términos propuestos por Panasonic eran razonables. Veamos.

En el contrato original con Quasar, BWAC ordenaba los productos a través de la oficina de Quasar en Miami, que luego —a raíz de la reorganización— fue trasladada a Atlanta. BWAC no tenía la obligación de comprar de Quasar un volumen específico de productos ni de mantener niveles específicos de inventario, ni se le requirió que realizara gestión específica alguna en el mercado de Puerto Rico. La única obligación de BWAC frente a Quasar se reducía a pagar por los productos que tuviera a bien ordenar. Una vez pagaba, acababan sus obligaciones con Quasar.

Mientras mantuvo su relación con Quasar, BWAC se ocupó de la promoción de los productos Quasar en Puerto Rico, a través del desarrollo de diversas campañas publicitarias. La recurrida también proveía facilidades para el almacenamiento en Puerto Rico de grandes inven-

---

[9] La buena fe impone a las partes un deber de lealtad recíproca en las negociaciones. *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517, 528 (1982). En palabras de Díez-Picazo: "La buena fe, en el sentido que aquí importa, es la lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. Lo que se aspira a conseguir, se ha dicho, es que el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados." Díez-Picazo, *La doctrina de los propios actos*, 1963, pág. 157, en *Int. General Electric v. Concrete Builders*, 104 D.P.R. 871, 876 esc. 4 (1976).

tarios de los productos Quasar y honraba la garantía de dichos productos a través de siete centros de servicio.

Los términos de entrega de los productos Quasar que recibía BWAC eran F.O.B. Miami, Atlanta y Japón, por lo que BWAC asumía los costos de transportación, fletes, seguros y arbitrios desde los puertos de Miami, Atlanta o Japón hasta su arrivo a Puerto Rico.[10] Los precios a los cuales adquiría BWAC los fijaba Quasar a su discreción, mientras que BWAC fijaba a su antojo los precios de los productos Quasar que vendía en sus tiendas. Quasar le concedía un crédito para la compra de productos por 30 días. También BWAC recibía descuentos por volumen. Es menester resaltar que la relación entre BWAC y Quasar no era inmutable puesto que ésta experimentaba periódicamente cambios en los precios de los productos. Toda esta relación se conducía por práctica comercial continua ya que, según señalamos antes, no existía contrato escrito entre las partes.

De los documentos que obran en el expediente se desprende que al iniciar las negociaciones para enmendar las relaciones, Panasonic le informó a BWAC de su interés en preparar un contrato *escrito*, en el cual se nombrara a BWAC como representante no exclusivo (*Non-Exclusive Retail Dealer*), para de esa forma continuar vendiéndole los productos Quasar a Ernesto Ruiz, Inc., tal como la codemandada Quasar había hecho hasta el momento.

La oferta final que Panasonic le remitió a BWAC en la misiva de 7 de abril de 1987[11] no colocaba a BWAC en una

---

[10] Cuando se establece en un contrato que la venta será F.O.B. o "Free on Board" en el punto de entrega, el vendedor asume los costos y riesgos de transportar los productos hasta ese punto de entrega. Una vez allí, (1) el riesgo de la pérdida de la cosa y (2) el título de los productos pasan del vendedor al comprador. Véase R. Anderson, I. Fox y D. Twomey, *Business Law*, 12ma ed., Ohio, Ed. South-Western Pub., 1984, pág. 345.

[11] Dicha carta disponía, en lo pertinente, lo siguiente:

"In an effort to increase the distribution of Quasar Products in Puerto Rico.... Our sales program for Authorize Quasar Dealers is the following:

"A. Terms

posición muy disímil a la que tenía antes con Quasar, pero, como ya señalamos, BWAC no aceptó, contestó ni hizo contraoferta.

Los cambios propuestos por Panasonic no eran drásticos o irrisorios. Se proponía que se suplieran los productos desde Puerto Rico, que se le diera asistencia a BWAC a través de centros de servicio y que se le ayudara en la venta a través de anuncios nacionales. Se establecería un plazo de crédito de 30 días, con un descuento si se realizaba el pago en los primeros 10 días; los precios cambiarían dos veces al año; recibiría un descuento por volumen y un descuento por furgón, y se requeriría un acuerdo sobre volúmenes mínimos de venta en unidades por cada línea de producto para cada trimestre.

BWAC entendió como perjudiciales la fijación de precios

---

"-Thirty (30) days.

"-Two percent (2%) rebate for payment within ten (10) days from date of billing.

"B. Pricing

"-Net/net base.

"-Delivered at your premises in Puerto Rico.

"-Price change twice a year (normaly January and July)

"C. Volume Rebate

"Sales achievement of two million dollars or more, by December 31, 1987, we will pay a two percent (2%) year-end rebate. This will be reviewed on January 1st., 1988.

"D. Drop Shipment

"We can also extend to you the option to place orders for drop shipment by trailer load. For orders by trailer load from one given factory, we will issue Two Thousand Dollars ($2,000.00) credit per trailer.

"Three-months advanced purchase projection needed.

"E. Services

"We will adhere to "Quasar" Warranty period as specified in product warranty card.

"Extend to Borg Wagner our internal warranty cost as outlined in our warranty checklist.

"We will athorize the seven (7) existing Quasar Servicenters to become PSC Authorized Servicenters for Quasar products and Borg Wagner as a self-servicing dealer of Quasar products contingent upon completion of our service agreement. We will also provide repair service through our current service-centers network.

"F. Advertising

"Two percent (2%) Coop Advertising on 50/50 basis.

"(Submittance of media invoices plus all advertising papers should be included with your invoice)."

más altos para algunos productos y los términos que la privaban de la alegada exclusividad de la que gozaba antes. Su postura, sin embargo, no es suficiente para establecer mala fe en las negociaciones de parte de las recurrentes. Si bien es cierto que en algunos casos los nuevos precios propuestos para los productos Quasar eran más altos que antes, no es menos cierto que en la relación anterior los precios fijados unilateralmente por Quasar cambiaban periódicamente. Además, BWAC nunca discutió extensamente los nuevos precios con Panasonic. También el aumento de precios estaba justificado, al menos en parte, porque en la nueva relación propuesta, BWAC no asumiría los riesgos ni tendría que incurrir en los gastos de transportación, fletes, seguros, arbitrios y almacenaje; costos que anteriormente BWAC tenía que absorber por completo.

Es menester señalar, además, que estos ofrecimientos de Panasonic a BWAC eran, en esencia, los mismos —incluso más favorables— que los que Quasar usualmente requería de todos los distribuidores con los que otorgaba contratos escritos para la distribución de los productos Quasar.

En cuanto a la alegación de privación de exclusividad, tampoco hallamos en el expediente prueba que demuestre que el contrato original le concedía exclusividad a BWAC. La recurrida siempre tuvo conocimiento de que los productos Quasar también se le vendían en Puerto Rico a Ernesto Ruiz, Inc., lo que BWAC nunca objetó. Además, no hay justificación alguna en el expediente para inferir una intención oculta y mezquina por parte de Panasonic de venderle los productos a sus propios detallistas una vez BWAC firmara el contrato.

La demandante recurrida también alegó que no se cumplió adecuadamente con el requisito de negociación de buena fe, porque en este caso, distinto al de *Medina & Medina v. Country Pride Foods*, supra, la negociación no ocurrió con el principal de la relación, sino con un tercero.

No nos convence su argumento. Si bien es cierto que las negociaciones sobre nuevos términos y condiciones ocurrieron entre BWAC y MEP/Panasonic, esta última parte era una afiliada de MECA/Quasar y para todos efectos prácticos representaba a ésta en las negociaciones. Después de todo, Panasonic habría de sustituir a Quasar en la relación revisada con BWAC, y poco importaba, para fines de las negociaciones, que éstas se llevaran a cabo con Quasar, más bien que con Panasonic.[12]

El propósito que persigue la doctrina al exigir que una negociación de buena fe preceda al retiro del mercado va indubitadamente dirigido a evitar prácticas opresivas de una empresa económicamente más poderosa sobre otra y así impedir que el distribuidor quede en estado de indefensión, huérfano de todo "poder de regateo". Lo esencial, en casos como el de marras, es determinar si el distribuidor efectivamente tuvo oportunidad de participar en la variación de los términos que finalmente le ofreció el principal y que estos nuevos términos y condiciones del contrato no sean irrazonables. Esto no significa, claro está, que ese distribuidor pueda regir de manera absoluta y arbitraria los destinos del principal.

En *Medina & Medina v. Country Pride Foods*, supra, pág. 190, reconocimos que "[n]o es posible interpretar

---

[12] Apuntamos en *J. Soler Motors v. Kaiser Jeep Int'l.*, supra, que no constituye un menoscabo de las obligaciones pactadas entre el distribuidor y su principal en un contrato de distribución directa, la mera cesión de éste a un distribuidor general, si bien implica que el concesionario tendrá que hacer sus negocios a través de dicho distribuidor general y no directamente con el principal.

Dijimos allí que "[e]n la transferencia de un producto del fabricante al consumidor generalmente intervienen en sus distintos niveles varios intermediarios que forman la cadena de distribución. Estos intermediarios pueden clasificarse en distintas formas, comerciantes mayoristas, agentes distribuidores, detallistas, concesionarios por franquicia, representantes de fábrica, etc. El proceso de distribución los incluye a todos, tanto al primer intermediario que es el distribuidor general como al último que transfiere el producto al consumidor, el detallista. La cadena de distribución ... en cada uno de sus niveles puede estar integrada por uno o más intermediarios. El mero hecho de que en la cadena de distribución se introduzca un nuevo intermediario, no altera la condición de distribuidor de la recurrida". *J. Soler Motors v. Kaiser Jeep Int'l.*, supra, pág. 139.

el estatuto de forma que el distribuidor pueda dirigir —al imponer sus condiciones— la política de venta del principal o viceversa, con la correspondiente pérdida de la autonomía económica y jurídica de ambos. Tal interpretación sería contraria al orden público en la medida que implicaría una limitación irrazonable a la libre determinación del hombre".

■ Señalamos, además, que en un contrato de distribución típico, el principal y el distribuidor "[n]o están vinculados por ningún pacto ni relación de dependencia que subordine una empresa a la otra. Cada empresario explota su propia empresa en su nombre, asume sus propios riesgos y busca su propio lucro. ... [A la luz de esto], es fácil advertir cómo en los contratos de distribución, que normalmente son de duración muy larga, se hace absolutamente necesario que, tanto principal como distribuidor puedan variar y negociar de buena fe los precios y términos de crédito para la venta de los productos objeto de la concesión". (Citas omitidas.) *Medina & Medina v. Country Pride Foods*, supra, págs. 187–189.

En el caso ante nos, a BWAC se le brindó la oportunidad contemplada en *Medina & Medina v. Country Pride Foods*, supra, pero no la aprovechó. Optó más bien por rechazar la oferta de Panasonic sin proponer alternativas. Por ello, la oportunidad que tuvo BWAC de negociar con Panasonic satisface los requerimientos de negociación de buena fe fijados en *Medina & Medina v. Country Pride Foods*, supra.

## C. *Preaviso*

En cuanto al requisito de preaviso, en el caso de marras nos encontramos con una situación atípica en la que no ocurrió el preaviso que dispusimos en *Medina & Medina v. Country Pride Foods*, supra, para casos de retiro del mercado. Ello se debió, según aduce la demandada recurrente, a que ésta no tuvo a priori la intención de retirarse del mercado.

En efecto, Quasar nunca cursó una carta con antelación para dar por terminada la relación con BWAC, precisamente debido a que su intención manifiesta era continuar las relaciones comerciales entre ellas. Así lo dejó saber en repetidas ocasiones, ni MECA ni MEP tenían planes de terminar la relación. Según hemos relatado ya, cuando se le informó a BWAC que ocurriría un cambio en la relación comercial, BWAC objetó éste, pero aun así se reunió a negociar varias veces con Panasonic aunque resultaron infructuosas las negociaciones. Luego, a pesar de que no se había logrado un acuerdo y aunque BWAC no había requerido todavía producto Quasar alguno, Panasonic tramitó una primera orden de los productos Quasar, con la intención de vendérselos a la demandante. Éste fue el único inventario que se trajo a Puerto Rico a base de lo que BWAC compraba regularmente antes. Una vez BWAC se negó a recibirlo, éste se liquidó al vender parte a Ernesto Ruiz, Inc., parte a instalaciones militares, parte en las Islas Vírgenes y el sobrante se le revendió a Quasar. Así las cosas, BWAC no volvió a comprar productos Quasar, y ni MECA/Quasar ni MEP/Panasonic volvieron a venderlos en Puerto Rico.

Como puede observarse de lo acontecido, BWAC tuvo tiempo suficiente para tomar una decisión deliberada respecto a su futuro comercial en relación con la representación de los productos en cuestión. Tuvo amplia oportunidad de adquirir los productos Quasar, a pesar de lo cual optó por no hacerlo. Contrario al caso típico de retiro del mercado, en que es el principal quien interesa abandonar el territorio y es el distribuidor quien se esfuerza por evitar el retiro del mercado de ese principal, en el de marras fue BWAC la parte que desertó de las negociaciones, se rehusó a recibir la mercancía y prácticamente forzó a Quasar a retirarse del mercado. A la luz de esto tenemos que concluir que en este caso no se dio justificadamente el preaviso que dispusimos en *Medina & Medina v. Country Pride*

*Foods*, supra. Resolvemos que tomando en cuenta los criterios sobre cuál debe ser el plazo de preaviso señalado en *Medina & Medina v. Country Pride Foods*, supra, sobre todo lo relativo a *"la naturaleza de los tratos que anteceden a la ruptura del contrato"*, en las circunstancias particulares del caso ante nuestra consideración no era indispensable el preaviso en cuestión. La situación que tenemos ante nos es distinta y se distingue de la de *Medina & Medina v. Country Pride Foods*, supra, puesto que, en esta circunstancia, el retiro del mercado del principal no fue una iniciativa de éste como en *Medina & Medina v. Country Pride Foods*, supra, sino más bien el resultado de la negativa del distribuidor a continuar comprando los productos.

 El propósito cardinal del plazo de preaviso que requerimos en *Medina & Medina v. Country Pride Foods*, supra, es permitirle al distribuidor conocer la intención del principal de abandonar el mercado con tiempo suficiente para que pueda prepararse para el cambio que dicho abandono pueda causar en sus propias operaciones mercantiles y, de esa manera, paliar los efectos negativos de la ruptura y proteger su futuro como empresario. Sin embargo, carecería de sentido exigir de forma inflexible ese preaviso en una situación como la que está ante nos ahora, en la cual, para la supervivencia de la empresa, hay una sustitución de un principal en Estados Unidos (MECA) por su afiliada en Puerto Rico (MEP), que interesa continuar la relación comercial con el distribuidor y propone cambios razonables en los términos y en las condiciones del contrato, y es el distribuidor quien se niega a continuar con la relación revisada y a adquirir los productos que el principal pone a su disposición, para obligar así al principal a retirarse del mercado.

Además, en cuanto a este aspecto es importante señalar que a finales de 1985 BWAC había adquirido la línea de productos competitivos marca Mitsubishi con el propósito de mercadear esta nueva marca de productos a través de

una tienda especializada que abrió con el nombre de *Quality Brands*. Esta tienda cerró tiempo después y BWAC comenzó a vender los productos Mitsubishi directamente en sus 17 tiendas. En 1986 BWAC redujo sus compras de Quasar a la mitad de lo que había comprado el año anterior, a la vez que multiplicó las unidades de Mitsubishi que compró.

La utilidad del preaviso depende de la integración más o menos estrecha que haya existido entre las empresas concedentes y concesionarias. Mientras menos líneas represente un distribuidor, mayor será su dependencia en cada línea que trabaja y mayor será la importancia del preaviso. *A contrario sensu*, la terminación de un contrato que tan sólo representa una pequeña fracción del negocio del distribuidor no le producirá graves desbalances en sus operaciones, por lo que la importancia del preaviso será menor. *Medina & Medina v. Country Pride Foods*, supra, pág. 191, citando a T. Puente Muñoz, *El contrato de concesión mercantil*, Madrid, Ed. Montecorvo, 1976, pág. 174.[13]

En el caso que nos ocupa, estimamos que BWAC no puede alegar sorpresa y perjuicio por el abandono del mercado de la codemandada Quasar, cuando fue la misma BWAC quien se rehusó a recibir sus productos y deliberadamente se negó a continuar comprándolos, mientras aumentaba sustancialmente su inventario de productos parecidos de otra marca. En justicia, no podemos actuar con el automatismo que reclama la recurrida. No podemos insistir en la aplicación mecánica del requisito de preaviso cuando, a la luz de las circunstancias particulares de este

---

[13] Señala Puente Muñoz, citando a Díez-Picazo, que "el ejercicio de esta facultad de denuncia o receso del contrato debe de estar condicionado por las exigencias de la buena fe y por los usos de los negocios (art. 1.1285). Y estas condiciones son, precisamente, que la denuncia del contrato debe supeditarse a que haya transcurrido el plazo de tiempo mínimo necesario para que la relación produzca los efectos que le son propios. *Y en ocasiones* la necesidad de un preaviso". T. Puente Muñoz, *El contrato de concesión mercantil*, Madrid, Ed. Montecorvo, 1976, pág. 159.

caso, éste no sólo no tenía propósito alguno sino que, además, conduciría a un resultado anómalo, visto que el retiro fue provocado por el distribuidor y no por un plan previo del principal.

Veamos por último si Quasar se aprovechó del mercado creado por BWAC en Puerto Rico.

### D. *Intento de apropiarse de la plusvalía o clientela fruto de la actividad del distribuidor*

■ De los hechos antes relatados resulta evidente que las recurrentes no se aprovecharon del mercado creado por la recurrida. Hemos dicho que un principal se aprovecha de la plusvalía o clientela desarrollada por el distribuidor mediante el establecimiento en Puerto Rico de facilidades para la distribución directa de mercancías o la prestación de servicios que antes habían estado a cargo del distribuidor. En el caso de marras, no existe prueba alguna de que MECA/Quasar o MEP/Panasonic hayan vendido algún producto Quasar en Puerto Rico, o que hayan nombrado distribuidores, agentes o detallistas a esos fines, luego de haber dispuesto de la mercancía rechazada por BWAC. De hecho, cuando BWAC se negó a adquirir los productos Quasar que Panasonic puso a su disposición, esta compañía tenía en ese momento 350 detallistas que vendían sus propios productos Panasonic y Technics a través de 500 tiendas, y a ninguno de éstos le ofreció ni le vendió los productos Quasar en cuestión.

La recurrida argumenta que a pesar de que Quasar y Panasonic se venden como marcas separadas y distintas, en realidad son productos iguales que compiten en el mercado ante los mismos consumidores. Como consecuencia de lo anterior, pretende que interpretemos que Panasonic se está aprovechando del mercado desarrollado por BWAC porque la clientela de BWAC, que antes compraba Quasar, ahora comprará Panasonic y Technics. No podemos suscribir esa posición.

La forma usual de aprovecharse del mercado o plusvalía que BWAC había desarrollado sería por medio de la venta de los mismos productos Quasar enviados a Puerto Rico a través de otros canales o vendidos por otros distribuidores. Ese no es el caso ante nos. Afirmar que los consumidores que adquirían los productos Quasar en las tiendas BWAC ahora comprarán productos Panasonic y Technics, por los esfuerzos que BWAC hizo a favor de productos Quasar, es especulativo en extremo porque hay otras marcas en el mercado y la recurrida no presentó prueba que sustentara dicha inferencia, aun más difícil de adoptar por el hecho de que los productos Panasonic y Technics son más caros que los productos Quasar. A esto hay que sumarle el hecho de que Panasonic y BWAC no comparten los mismos consumidores, por encontrarse en diferentes estratas del mercado, ya que, como antes indicáramos, BWAC vende directamente al consumidor mientras que Panasonic le vende únicamente a una red de detallistas.

Una vez se ha determinado que los nuevos términos para la relación revisada que Panasonic le ofreció a BWAC eran razonables y que, en efecto, hubo un retiro total del mercado de la codemandada Quasar, la posibilidad de que Panasonic pudiese aprovecharse de la clientela o plusvalía creada por BWAC sólo podía resultar de la relación posterior revisada con Panasonic como nuevo principal y distribuidor general, la que nunca ocurrió puesto que BWAC no permitió que ésta comenzara.

### III

En resumen, en una relación comercial bajo el palio de la Ley 75, no obstante la amplia protección que ofrece dicha ley al distribuidor, ésta no es óbice para que el principal se retire del mercado, siempre y cuando el derecho de retirarse se ejerza de forma legítima para evitar la arbitrariedad de aquél que lo ejercita. En el caso de marras, Qua-

sar y Panasonic le cursaron a BWAC una invitación al diálogo para que las relaciones entre ellas continuaran, luego de proponerle un cambio —bajo un esquema de reorganización— que implicaba unas alteraciones en precios y términos de venta y crédito que, si bien no eran idénticas o más favorables para BWAC, tampoco eran arbitrarias o irrazonables ni quedó demostrado que fueran detrimentales para la condición y estabilidad de la demandante recurrida.

A falta de un contrato escrito entre BWAC y Quasar que limitara el término de su relación comercial, el contrato entre ambas no tenía que extenderse a perpetuidad con idénticos términos y condiciones. Tal como razonamos en *Medina & Medina v. Country Pride Foods*, supra, sería absurdo que el principal tuviera que escoger entre una de estas dos alternativas: (a) tener que aceptar, sin opción, los precios y términos de crédito que le imponga su distribuidor, o (b) dar por terminado el acuerdo o contrato y sufrir de todos modos las consecuencias de tener que pagar una cuantiosa compensación.([14])

Hemos expresado antes que "no fue la intención legislativa convertir los contratos de distribución en relaciones interminables. En primer término, porque dicha opción legislativa tropieza con serias objeciones constitucionales. En segundo lugar, porque ... principal y distribuidor no tienen intereses contrapuestos". *Medina & Medina v. Country Pride Foods*, supra, págs. 189–190. Esto cobra mayor fuerza y vigencia en un caso como el de marras, en el que Panasonic y BWAC se encuentran en diferentes estratas del mercado.

---

([14]) Sobre este extremo son ilustradoras las expresiones siguientes: "[I]f a large diversified company, as part of a corporate reorganization to reduce debt, sold off all assets required for manufacture of a product line to a third party and thereby became unable to supply its distributors, would it be required to compensate the Puerto Rican distributor of that product? ... a reading [of the statute] consonant with the legislative purpose would not [require compensation]." S. Antonetti Zequeira, *A Different Opinion About "Just Cause"*, 58 Rev. Jur. U.P.R. 625, 632 (1989).

Como antes expresáramos, al redactar la Ley 75, el propósito específico del legislador fue brindar un remedio *cuando el principal elimina al distribuidor sin justa causa y establece en Puerto Rico facilidades para la distribución directa* de mercancías o la prestación de servicios que previamente habían estado a cargo del distribuidor, aprovechándose de este modo del mercado (clientela) desarrollado por el primero. *Medina & Medina v. Country Pride Foods*, supra, pág. 189; *San Juan Merc. v. Canadian Transport Co.*, 108 D.P.R. 211 (1978). La intención de la Ley 75 fue proveer una compensación por la *terminación arbitraria* sin justa causa y *salvaguardar*, sin embargo, la flexibilidad necesaria para que la empresa mercantil suplidora pudiera *organizar y reorganizar su sistema de distribución* de forma eficiente y económica. Nuestro sistema de libre competencia así lo exige. *Roberco, Inc. y Colón v. Oxford Inds., Inc.*, 122 D.P.R. 115, 132 (1988).

La Ley 75 no puede ser una camisa de fuerza que restrinja todo movimiento del principal *per saecula saeculorum*, sin considerar situaciones meritorias como la que hoy está ante esta Curia. Somos del criterio que en el caso de marras, el retiro justificado del mercado de la codemandada Quasar constituyó justa causa para poner fin a su relación con BWAC, lo que está permitido bajo la Ley 75.

## IV

En cuanto a la reclamación bajo el Art. 1802 del Código Civil, *supra*, por interferencia ilegal contra MEP, la codemandada recurrente alega que ésta estaba prescrita. Aduce que la demandante tuvo conocimiento de la alegada sustitución o transferencia de Panasonic por BWAC, que supuestamente constituyó la interferencia torticera más de un año antes de presentar esta acción. Estamos de acuerdo.

Surge de la sentencia recurrida que en enero de 1987 el

Gerente de Mercadeo de BWAC, William Winders, recibió información de un vendedor de Quasar, Robert Nocera, referente a que esta última había decidido quitarle a BWAC la distribución de sus productos en Puerto Rico para entregársela a Panasonic. En ese mismo mes, David Bearden, Gerente de Zona de Quasar, se reunió con Winders y le reiteró la información adelantada por Nocera.

A raíz de esto, el 4 de febrero de 1987, Winders le envió una carta a Quasar para informarle que desde hacía aproximadamente un mes BWAC tenía conocimiento de la decisión de Quasar de nombrar distribuidor de los productos Quasar en Puerto Rico a Panasonic, y expresaba su decepción porque Quasar no decidió nombrarla como distribuidora en Puerto Rico "y sí a su competidor Panasonic". Añadió que se oponía a dicha decisión porque tendría un impacto negativo para BWAC y que le constaba que Panasonic estaba al tanto de ésta.

El 10 de febrero de 1987 el Presidente de Quasar, Jack Pluckhan, le confirmó por escrito a BWAC la decisión de "consolidar las operaciones de venta de Panasonic y Quasar en Puerto Rico". Le indicó su intención de continuar haciendo negocios con BWAC de manera que, en lo sucesivo, BWAC adquiriera los productos Quasar a través de Panasonic.

 Sabido es que la acción para exigir responsabilidad civil por las obligaciones derivadas de la culpa o negligencia de que se trata en el Art. 1802 del Código Civil, *supra*, prescribe por el transcurso de un año "desde que lo supo el agraviado". Art. 1868 del Código Civil, 31 L.P.R.A. sec. 5298. *Cintrón v. E.L.A.*, 127 D.P.R. 582 (1990); *Ortiz v. Municipio de Orocovis*, 113 D.P.R. 484 (1982).

BWAC, desde enero de 1987, conoció de la información que dio comienzo al período de prescripción extintiva de la acción. La demandante admite que en enero de 1987 se enteró de la alegada actuación dolosa de MEP. Por propia admisión de la demandante, ya para esa fecha ésta tenía

conocimiento de la intención de ambas demandadas y manifestó el daño que esa decisión le ocasionaba, inclusive, el 4 de febrero de 1987 confirmó por escrito que tenía conocimiento de que Panasonic estaba al tanto de la transferencia. Posteriormente, cualquier duda quedó despejada con la misiva de 10 de febrero de 1987 que el presidente de Quasar le envió a BWAC para ratificar por escrito su decisión de nombrar distribuidor general exclusivo a Panasonic.

Finalmente, en una de las alegaciones de la demanda BWAC expresamente manifiesta que en la reunión que sostuviera *con los representantes de Panasonic el 5 de marzo de 1987*, "reiteró su oposición a que se instrumentara la decisión anunciada y le advirtió a Panasonic que la misma causaría graves y cuantiosos daños económicos a BWAC". No obstante, no es sino hasta el 8 de marzo de 1988 cuando BWAC instó la acción fundamentada en estos hechos.

La demandante alega que la causa de acción no se materializa hasta que ocurra el daño. No le asiste la razón. En ocasiones anteriores hemos expresado que "[l]a incorporación de elementos imponderables a la duración del término tales como la ignorancia de la cuantía del daño o del resultado final del acto culposo, [no hace sino] enerva[r] la cualidad esencial de fijeza y certidumbre en la prescripción que tan sabiamente ha protegido nuestra jurisprudencia.... La exigencia de certeza, que es savia de las instituciones de Derecho Civil, demanda la exclusión de elementos evasivos, hasta donde sea posible, en el cómputo del término de prescripción". (Citas omitidas.) *Ortiz v. Municipio de Orocovis*, supra, pág. 486.

Es norma reiterada que en las acciones para exigir responsabilidad civil se cuenta el término de prescripción a partir del momento cuando tuvo conocimiento del daño, quien lo sufrió, aunque no es preciso que éste conozca la cantidad líquida del importe de ese daño. No se infringe ese principio de conocimiento del agraviado, por la

sola circunstancia de que éste ignore la cuantía o magnitud de los daños causados. *Ortiz v. Municipio de Orocovis*, supra.([15])

▮ En más de una ocasión hemos expresado que la figura de la prescripción extintiva fomenta la concepción de que las reclamaciones válidas se ejerzan con premura y no se abandonen. *Rivera Castillo v. Mun. de San Juan*, 130 D.P.R. 683 (1992); *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991). Ahora, no podemos avalar el descuido de la demandante recurrida. Resulta claro que el daño era ya una realidad perceptible desde que, en febrero de 1987, Quasar le confirmó por escrito a BWAC su decisión irrevocable de que Panasonic sería el nuevo distribuidor general exclusivo de los productos Quasar en Puerto Rico. En esa fecha, BWAC ya conocía la identidad de la causante o responsable de la alegada interferencia torticera y estaba en posición de presentar una demanda contra ésta. En consideración a lo anterior, es forzoso concluir que el año para ejercitar la acción ya había expirado cuando la demandante interpuso demanda el 8 de marzo de 1988. El término prescriptivo nunca fue interrumpido;([16]) la demandante perdió, pues, su derecho a reclamar, si era que tenía alguno.

En vista de que la acción contra MEP estaba prescrita,

---

([15]) En *Ortiz v. Municipio de Orocovis*, 113 D.P.R. 484 (1982), este Tribunal dispuso que, ya en conocimiento del daño, la demandante no podía esperar el desarrollo y grado final de su lesión y posponer a su arbitrio y apreciación subjetiva el curso del plazo de prescripción.

([16]) La prescripción de las acciones se interrumpe por el ejercicio de las mismas ante los tribunales, por reclamación extrajudicial del acreedor o mediante cualquier acto de reconocimiento de deuda por parte del deudor. Art. 1873 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5303.

Hemos examinado la Misiva de 12 de marzo de 1987 que BWAC le envió a Quasar para exigirle que la restituyera a la relación original y para apercibirle de que tomaría acción legal en su contra al amparo de la Ley 75. No obstante, no hace BWAC reclamación alguna contra MEP ni menciona acción alguna por interferencia torticera. Es forzoso concluir, pues, que esta carta no pudo constituir una reclamación extrajudicial que interrumpiera el término prescriptivo de un año del Art. 1802 del Código Civil, *supra*, por interferencia culposa contra MEP.

es innecesario considerar y discutir si MEP era un tercero o no a los fines de la alegación de interferencia.

Por los fundamentos antes expuestos, *se dicta sentencia revocatoria de la del Tribunal Superior, Sala de Carolina.*

El Juez Asociado Señor Rebollo López concurrió sin opinión escrita. Los Jueces Asociados Señores Negrón García y Alonso Alonso se inhibieron.