# United States Court of Appeals

## For the First Circuit

Nos. 02-2578, 02-2659

IN RE: MI-LOR CORP.; PROFESSIONAL BRUSHES, INC.,

Debtors.

JAMES M. LISTON; JOHN J. MONAGHAN, as Creditors Trustees,

Plaintiffs-Appellants, Cross-Appellees,

v.

ROBERT GOTTSEGEN; MICHAEL GOTTSEGEN;
LORI GOTTSEGEN ZINMAN; DOROTHY GOTTSEGEN,

Defendants-Appellees, Cross-Appellants.

CROSS-APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,
Siler,* Circuit Judge,
and Lynch, Circuit Judge

Howard M. Brown, with whom Frank F. McGinn and Bartlett
Hackett Feinberg P.C. were on brief for plaintiffs-appellants,
cross-appellees.
Stephen F. Gordon, with whom Ronald W. Dunbar, Jr., Leslie F.
Su, Gordon Haley LLP and Henry Mark Holzer were on brief for
defendants-appellees, cross-appellants.

November 3, 2003

_____
      *Of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. This case explores the Massachusetts law of close corporations and the ability of those corporations to give releases of claims of self-dealing. A jury found that the defendants, an officer/director and the controlling shareholders in two close family corporations, had unjustly enriched themselves from corporate funds in the sum of over $380,000. This appeal concerns whether that liability was extinguished by a release in favor of the defendants that was executed by the corporation and its remaining directors and shareholders on March 31, 1990, as part of mutual releases given in connection with a stock redemption of the defendants' shares. If liability is extinguished, then the plaintiffs, who are creditors in bankruptcy standing in the shoes of the corporation, cannot recover on the jury verdict.

The district court did not reach the questions about the validity and enforceability of the release because it ruled that the creditors could not assert such claims -- essentially, that they lacked standing. While that standing analysis has some attraction, it is ultimately unpersuasive. The questions about the release will have to be addressed on remand because this record does not permit their resolution. No Massachusetts case is directly on point as to the standards to be used. This opinion attempts to provide guidance for the case on remand, in an area of law marked by ambiguity and inconsistency.

Mi-Lor Corporation was in the business of manufacturing, distributing, and selling plastic dental and hair products, such as toothbrushes and combs. The company was formed under Massachusetts law in 1977 by three family groupings -- the Robert Gottsegen family, the Stuart Gottsegen family, and the Lawrence Gottsegen family[1] -- and an individual named Larry Wald. Robert was the president of the company, and he, Stuart, and Wald served as Mi-Lor's directors. Lawrence was primarily responsible for sales; Wald was responsible for Mi-Lor's financial operations.

Robert's children, Lori and Michael, and Robert's ex-wife, Dorothy, were stockholders of the company, as were Stuart, Lawrence, and Wald.[2] Two trusts, one for the benefit of Michael and one for the benefit of Lori, also owned Mi-Lor stock. Lawrence was the trustee of both trusts. Although Robert did not own Mi-Lor stock, he effectively controlled the company in his capacity as the sole voting trustee of a voting trust that owned sixty-five percent of Mi-Lor's voting stock. Wald was the only stockholder who was not a member of the voting trust. The voting trust included all of the stock held by Dorothy, Lori, Michael, and the two trusts. To the extent that Robert's interests were aligned with the interests

---

[1]     Stuart is Robert's brother and Lawrence is Robert's cousin.

[2]     Arthur Gottsegen, John Bambera, and Anthony Glydon were stockholders initially, but they sold their stock in the 1980s.

of the other members of his family unit, the Robert Gottsegen group effectively functioned as one unit in three intertwined capacities: as the president, as a director, and as the majority shareholder of Mi-Lor.

Professional Brush, Inc. ("Pro Brush") was formed in 1987 and was in the business of manufacturing, distributing, and selling toothbrushes and other dental care products. Robert was president and a director of the company; Lawrence, Stuart, and Wald were the other directors. Michael and Lori owned Pro Brush stock, as did Steven Gottsegen, Stuart, and Wald.

In 1989, Robert suffered a heart attack. On March 31, 1990, pursuant to a stock redemption agreement, Mi-Lor redeemed all of the shares held by Michael, Lori, Dorothy, and the two trusts. As of the same date, the voting trust was terminated, Robert resigned as both president and director, and the management of the corporation changed accordingly.[3] As part of the redemption agreement, in exchange for 2,480 shares of stock and for other consideration (including "consulting, confidentiality and noncompetition" agreements with Robert and Dorothy, and "confidentiality and noncompetition" agreements with Lori and

_____

[3] Initially, Wald became president and Lawrence filled the director position vacated by Robert. Then, after Wald died in 1991, Stuart became president and Steven, Lawrence's son, filled the vacant director position. After Wald's death, Lawrence allegedly first discovered and investigated Wald's misuse of corporate funds. Mi-Lor filed suit in state court against Wald's estate in July 1992.

Michael), Mi-Lor assigned to Michael, Lori, Dorothy, and the trustee of the two trusts the proceeds (totaling approximately $1 million) from the merger of Solo Products, Inc. into Mi-Lor and granted them entitlements to receive certain other payments.

Also on March 31, 1990, Michael and Lori entered into a stock redemption agreement with Pro Brush, whereby Michael and Lori each received twenty-five dollars in exchange for the 625 shares of Pro Brush stock that each held. Pursuant to a provision in this redemption agreement, Robert resigned as president and director of Pro Brush.

As part of the Mi-Lor stock redemption agreement,[4] Robert, Dorothy, Lori, Michael, and the two trusts (the "Redeeming Principals" or the "Robert Gottsegen group") also entered into an Agreement of Mutual Release (the "Release") with the company and its remaining principals[5] on March 31, 1990. Under its terms, Mi-Lor and its remaining shareholders agreed to release the Redeeming Principals from "any and all actions, causes of action, damages, . . . claims or demands of whatever kind or nature . . . which the

---

[4] Several agreements were executed ancillary to the Mi-Lor stock redemption agreement. Pursuant to a consulting agreement, for example, Robert remained connected to Mi-Lor. Within a year of the stock transaction, Robert instituted an arbitration proceeding to force Mi-Lor to pay him according to the terms of the consulting agreement. The parties settled and Mi-Lor agreed to pay Robert.

[5] The remaining principals were Wald, Stuart, Lawrence, Joan Gottsegen, Steven Gottsegen, and four trusts (two for which Lawrence served as trustee and two for which Sandra Gottsegen served as trustee).

Company and Remaining Principals ever had or claimed to have" relating to "any act, omission, cause or thing done or omitted" with respect to the "formation, incorporation or operation of the Company . . . ." The Release excluded claims related to "the continuing obligations owed by the Redeeming Principals . . . under the terms . . . of the Redemption Agreement ... and the collateral . . . agreements" and claims arising from "any legal proceeding initiated by Alfred Stauble." The Release was signed by all of Mi-Lor's shareholders and all of its directors. It is this release that is at issue here.

In June 1994, the Redeeming Principals sued Mi-Lor in state court alleging that they were owed additional payments under the stock redemption agreement based on Mi-Lor's attainment of a specified level of pre-tax earnings. They also alleged fraud on the part of Mi-Lor in the termination of the voting trust. A default judgment was entered against Mi-Lor for $226,984.80, and the voting trust was reinstated. On February 10, 1995, the Redeeming Principals and Mi-Lor entered into a settlement agreement whereby the voting trust was again terminated and Robert was elected a director but agreed not to prevent Mi-Lor from filing for bankruptcy.

On March 3, 1995, Mi-Lor and Pro Brush voluntarily filed Chapter 11 petitions. On February 28, 1997, Mi-Lor and Pro Brush, as debtors-in-possession, brought an adversary proceeding against

the Redeeming Principals alleging a host of claims.  Among other things, the complaint alleged that the Redeeming Principals had caused Mi-Lor to pay for their personal expenses and make other expenditures for their benefit that had no legitimate corporate purpose.[6]  The defendants' affirmative defenses included the Release and the statute of limitations.

On November 2, 1998, the bankruptcy court confirmed the Second Amended Liquidating Joint Plan of Reorganization of the Debtors.  The court's order established that all property of the Mi-Lor and Pro Brush bankruptcy estates would thereafter be vested in the Creditors Trust and that the trustees of the Creditors Trust would succeed to the debtors' right to bring or continue causes of action.  Subsequently, James M. Liston and John J. Monaghan, in their capacity as Creditors Trustees, replaced Mi-Lor and Pro Brush as plaintiffs in the corporations' suit against the Redeeming Principals.

The defendants moved for summary judgment based on the release and statute of limitations defenses, and the bankruptcy court denied the motion on February 26, 1999.  On May 7, 1999, the bankruptcy court <u>sua sponte</u> vacated its February 26 order and granted partial summary judgment to the plaintiffs on the statute of limitations defense.  Discovery ensued.  The defendants filed a

---

[6]  It was through the discovery proceeding in the state suit against Wald's estate (<u>see</u> <u>supra</u> note 3) that Lawrence claims to have first learned of Robert's misuse of Mi-Lor funds.

motion to vacate the May 7 order in December 2000, and the district court denied that motion on January 25, 2001 after de novo review.

During the five day trial in April 2001, the parties disagreed, among other things, about the extent to which the defendants had received personal payments, about whether the defendants had reimbursed the company for the payments of personal expenses they did receive, and about whether the defendants had made loans to the company. There was general agreement, however, that Mi-Lor funds were indeed used to pay the personal expenses of the defendants in the first instance, and that other directors/shareholders in Mi-Lor also received payments of personal expenses. By agreement, the release defense was not submitted to the jury.

In a special verdict, the jury found that Mi-Lor had paid $380,807.66 of the Redeeming Principals' personal, non-business expenses and that the Redeeming Principals had not reimbursed Mi-Lor for such payments.[7] Among the allegedly unreimbursed payments shown to have been made to Robert and other members of his family unit were country club dues and expenses; payments to pharmacies for medications; automobile expenses; payments for telephone calls from

---

[7]    The special verdict did not specifically characterize the finding as one of "unjust enrichment." The district court's August 17, 2001 memorandum and order stated that the "jury found in favor of the plaintiffs on the unjust enrichment claim." The defendants did not raise an objection to the characterization of the jury verdict as a finding of unjust enrichment and have waived the issue.

-9-

Robert's home in Bermuda; legal fees for litigation to which Mi-Lor was not a party; payments to Robert's divorce lawyers; monthly payments to Robert's mother; rent payments for an apartment occupied by Michael; and monthly payments to Dorothy.

The parties filed motions for judgment as a matter of law under Rule 50 regarding whether the Release should bar the unjust enrichment claim, and the district court scheduled an evidentiary hearing on that issue. The parties then agreed to have the district court decide the issues pertaining to the Release without hearing further evidence, so the district court cancelled the hearing.

The district court's memorandum and order on the parties' respective motions for judgment as a matter of law concluded, against the plaintiffs, that the Release was (1) executed by Mi-Lor, because there was sufficient evidence that Mi-Lor had assented to it, despite its formal shortcomings, and (2) enforceable, because it was executed at a time when no duties were owed to Mi-Lor's creditors. The district court entered judgment in favor of the defendants.

The Creditors Trustees appeal the district court's decisions to deny their motion for judgment as a matter of law regarding the Release and to allow the defendants' motion for judgment as a matter of law. The defendants' cross-appeal on the statute of limitations ruling argues that their statutory and

-10-

constitutional rights were violated when the bankruptcy court <u>sua sponte</u> granted summary judgment to the plaintiffs on May 7, 1999.

## II.

### A.  Creditors Trustees as Plaintiffs

The district court construed the question of the validity and enforceability of the Release as an issue of law.  It first determined that the Release had been executed by the corporation, even though no signature qua corporation was designated.[8]  It also determined that the broad scope of the Release would cover the unjust enrichment claims, if the Release was deemed valid and enforceable.

The district court then explained that the corporation's shareholders could have brought a derivative action if the unjustly enriched participants had acted to the detriment of the corporation in executing the Release.  However, the court held that the plaintiffs here were creditors and could not bring an action challenging the Release unless its execution contributed to the corporation's insolvency or took place while the corporation was insolvent.  Because the corporation was not insolvent at the time of the Release and there was no evidence suggesting that the Release contributed to its subsequent insolvency, the court ruled:

---

[8]    The plaintiffs argued that no one had signed the Release specifically on behalf of Mi-Lor.  The plaintiffs' attack is without merit.  There was ample evidence to support the district court's factual determination.

-11-

> While shareholders may have been able to object to the Release, in fact, every shareholder signed it. The fact that Mi-Lor is presently insolvent does not mean that the Release suddenly becomes invalid as a result of duties owed to creditors or to the corporation on behalf of the creditors. Invalidating the Release years after its execution because of its adverse effects on creditors' interests would create fiduciary duties to creditors where they simply do not exist.

Accordingly, the court did not reach the questions raised about the validity and enforceability of the Release.

On appeal, the plaintiffs argue that the court applied the wrong analytical principles in choosing to deny creditors the ability to pursue claims as substitute plaintiffs for the corporation. They argue that the company, as debtor-in-possession, properly filed an adversary proceeding against the defendants pursuant to the rules of the federal bankruptcy system. This position is correct. A corporation may bring an action against its directors, current or former, for self-dealing. See Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429 (1st Cir. 1996) (applying Massachusetts law). And a debtor-in-possession may commence an action without court approval. Collier on Bankruptcy ¶ 323.01 (15th ed. rev.).

The Creditors Trustees then argue that, by order of the bankruptcy court, they properly stepped into the shoes of the corporation as plaintiffs. In those shoes, they are asserting the corporation's right to recover to the estate the amount of the unjust enrichment. That they, as creditors, would be the real

beneficiaries of any recovery is, they say, happenstance and does not alter the fact that they sue in the shoes of the company. The defendants do not contest this proposition; indeed, no objection was made to the bankruptcy court when it permitted the creditors to sue, and the case was characterized to the jury as just explained.

While the district court's contrary view is a well-reasoned position,[9] it ultimately must give way on the question of standing. The court's intuition does, though, inform the analysis later.

The Creditors Trustees may properly stand in the shoes of the corporation and its shareholders for purposes of the suit because they are continuing the corporation's cause of action, not initiating a separate action on behalf of creditors. See Collier on Bankruptcy ¶ 541.08 (15th ed. rev.) ("The trustee . . . stands in the shoes of the debtor corporation in prosecuting a cause of action belonging to the debtor . . . ."); id. ¶ 323.01 ("A trustee appointed in a chapter 11 case . . . is automatically substituted as a party in any pending action, proceeding or matter and therefore has the same rights and obligations as the . . . debtor in possession."). When a corporation sues its fiduciaries or a

---

[9] Frequently, the statute of limitations will bar claims by creditors pursuing actions in the capacity of the corporation when those claims reach back to transactions from years earlier. In addition, some claims of this sort may trigger a successful laches defense. But here, the district court correctly determined that the statute of limitations was no bar, and no laches defense was raised.

stockholder brings a derivative suit against corporate fiduciaries to enforce the corporation's rights, any recovery for the fiduciary breach belongs to the corporation.[10] See, e.g., Bessette v. Bessette, 434 N.E.2d 206, 208 (Mass. 1982) ("It is a basic principle of corporate law that if a majority shareholder receives corporate cash distributions and a salary in excess of the reasonable value of services rendered, the right to recover the overpayments belongs to the corporation."). Sums recovered by a corporation in such suits are paid first to creditors, before any distributions are made to shareholders.[11] See Bagdon v. Bridgestone/Firestone, Inc., 916 F.2d 379, 383 (7th Cir. 1990) ("Recoveries [in derivative suits] pass through the corporate treasury, a process that both protects creditors (who get first dibs) and avoids questions of apportionment . . . ."). As a result, the issues pretermitted by the district

---

[10] In some circumstances, the Donahue doctrine permits stockholders of close corporations to sue for direct injuries and recover personal relief for breaches of fiduciary duties owed directly to them. See Donahue v. Rodd Electrotype Co., 328 N.E.2d 505, 515 (Mass. 1975). Such a suit for personal relief is appropriate where it would be difficult to establish a breach of duty owed to the corporation, as in the case of a freeze-out of minority shareholders. Id. at 514-15. The Creditors Trustees, however, do not sue as Donahue plaintiffs.

[11] This result explains why the plaintiff in Bessette refused to assert a derivative rather than a direct claim. Bessette involved a company on the verge of bankruptcy, and as one commentator explained: "The plaintiff presumably wanted personal relief because he feared the corporation's creditors, not its stockholders, would reap the benefits of any recovery in a derivative action." Richard W. Southgate & Donald W. Glazer, Massachusetts Corporation Law & Practice § 16.5(b) (2003 Supp.).

-14-

court about the validity and enforceability of the release must be reached.

In one sense it is quite true that the other shareholders were the victims of the unjust enrichment and of any failure to make adequate disclosure to them in securing the Release, and they are not complaining about either. But to the extent that unjust enrichment occurred, it was through a misuse of the corporation's assets; and the Release, although ratified by the shareholders, was a corporate act surrendering a claim of the corporation. Whatever right the corporation may have to recover for unjust enrichment, through the invalidation of the Release, is an asset of the corporation and now belongs to the creditors.

**B. Standard for Determining the Enforceability of the Release**

In essence, this case involves two claims of fiduciary breach. The first, on which the jury found for the plaintiffs, is that the Redeeming Principals had unjustly enriched themselves from the corporation's coffers. The second claim is that the Redeeming Principals committed a fiduciary breach that renders the Release unenforceable. The plaintiffs argue that the Release is unenforceable at a minimum because the defendants failed to disclose the material details of their unjust enrichment to Mi-Lor's remaining shareholders and directors when seeking the Release. They also argue that the Release is unenforceable because the defendants have not demonstrated that the Release was fair to the company.

-15-

At issue, then, is the standard for determining the enforceability of a release, executed by a close corporation and its directors and shareholders, of claims later proven to a jury that certain corporate directors and shareholders unjustly enriched themselves at the expense of the corporation. There is no Massachusetts case directly on point.

Corporations, whether close or public, have a strong interest in being able to give valid and enforceable releases. A release of claims by a close corporation in particular, even a release of self-dealing claims against its controlling shareholders, may benefit the close corporation by allowing it to resolve internal disputes in a swift and cost-effective manner and by enabling it to facilitate the termination of the involvement of its principals.[12] Close corporations like Mi-Lor also present fewer concerns about possible injury to the investing public from the actions of

_____

[12] Massachusetts does not prohibit a company from releasing directors from claims of self-dealing. Massachusetts does prohibit a corporation from including in its articles of organization a provision that eliminates or limits the liability of a director: (1) for any breach of the director's duty of loyalty to the corporation or its stockholders; (2) for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law; (3) for illegal distributions to stockholders and improper loans to directors or officers; or (4) for any transactions from which the director derived an improper personal benefit. Mass. Gen. Laws ch. 156B, § 13(B)(1.5). And a Massachusetts corporation may not enact a by-law that conflicts with either a statute or its articles of organization. Ch. 156B, § 16; Assessors of Boston v. World Wide Broadcasting Foundation of Mass., Inc., 59 N.E.2d 188, 191 (Mass. 1945) (noting that by-laws may not enlarge or alter the powers conferred by the articles of organization or by statute).

-16-

corporate directors and shareholders than do public corporations or charitable corporations.  And where all of the shareholders (as opposed to the directors) of a close corporation execute a release after having received full disclosure, there are self-evident policy reasons to enforce such a release.

Even so, within close corporations there are fiduciary duties imposed on directors, officers, and, for some purposes, shareholders, in connection with their respective dealings with, and on behalf of, the close corporation and its shareholders.  See Demoulas v. Demoulas Super Mkts., Inc., 677 N.E. 2d 159, 179-80 (Mass. 1997); Donahue v. Rodd Electrotype Co., 328 N.E. 2d 505, 515-16 (Mass. 1975).  The release transaction involved here was not entered into by two or more independent business entities, but rather, was an entirely intra-corporation transaction -- entered into by the close corporation itself (acting through the ratification of its shareholders) with its own principals.  The intra-corporation nature of the transaction, the plaintiffs argue, gave rise to certain fiduciary obligations by the Redeeming Principals.

In Demoulas, the most recent Massachusetts case about self-dealing, the plaintiff brought a derivative action against the president/director/voting trustee of a close corporation and certain affiliated persons and entities, alleging that the defendants had diverted corporate opportunities and engaged in self-dealing.  677

N.E.2d at 165-66. The Supreme Judicial Court explained that a corporate fiduciary is not entirely barred from pursuing a corporate opportunity or entering into a self-dealing transaction. When such actions are taken, though, the corporate fiduciary has a duty to disclose the details of the opportunity/transaction to the corporate decision-makers and, at least when the decision-makers are interested directors, has the burden of proving that the opportunity or transaction is fair. Id. at 180-82. The court summarized the standard as follows:

> In short, to meet a fiduciary's duty of loyalty, a director or officer who wishes to take advantage of a corporate opportunity or engage in self-dealing must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation.

Id. at 182.

It is clear from Demoulas that Massachusetts imposes on corporate fiduciaries a duty of full disclosure of material facts in connection with self-dealing. Material information about the self-dealing transaction is needed to make an educated decision about whether to allow it, and in the case of a self-dealing release, information about the conduct of the potential recipients of the release is necessary for deciding whether to grant the release encompassing such conduct. Thus, the Demoulas rule protects decision-makers by giving them information.

-18-

But Demoulas does not explicitly address the question of whether full disclosure to interested shareholders suffices in the context of a release given with unanimous shareholder consent.[13] And more generally, Demoulas leaves open the question of the effect of ratification by interested shareholders and the question of what role fairness plays when interested shareholders have ratified.

The law in this area is a tangled web. Language from cases in both the Supreme Judicial Court and in this court could, if lifted out of context, be taken to mean that a showing of fairness is always a requirement. See Winchell v. Plywood Corp., 85 N.E.2d 313, 316-17 (Mass. 1949) (requiring a self-dealing corporate fiduciary to prove full disclosure and fairness to the corporation); Boston Children's Heart Foundation, Inc. v. Nadal-Ginard, 73 F.3d 429, 433-34 (1st Cir. 1996) (same, applying Massachusetts law). This language in modern opinions, which seems to invoke a universal requirement of showing fairness, is at odds with older cases saying that transactions between corporations and their fiduciaries that are open and informed may be approved by the express "consent of all the stockholders." Warren v. Para Rubber Shoe Co., 44 N.E. 112, 113 (Mass. 1896) (holding that a corporation

---

[13] It is unclear from the quoted language from Demoulas whether the term "disinterested" modifies only "directors" or modifies both "directors" and "shareholders." That is, can shareholders assent only if they are disinterested? If the modifier applies to both words, then, apparently, interested shareholders cannot, even upon full disclosure and unanimous agreement, approve self-dealing by corporate fiduciaries.

-19-

could contract with directors when the contract was made openly and with the assent of all the stockholders and the stockholders were not ignorant of the terms of the contract or of the self-dealing relationship between the contracting parties). Until Massachusetts addresses these questions directly, we are left to work out the issue.

On balance, we conclude the wiser rule is that where there is unanimous and fully informed shareholder approval in a close corporation, such approval suffices (subject to special rules for insolvency). If there is not full disclosure and unanimous approval, the question arises whether a showing of fairness alone would suffice to validate the Release. This appears to be the rule in most jurisdictions, Gevurtz, Corporation Law 324 (2000); yet a very literal reading of Demoulas' language quoted above might suggest the need for both full disclosure and fairness -- although this variation was not decided there. Quite possibly the question need not be answered in the present case (and we do not seek to do so) because, if the transaction embracing the Release was fair, arguably this means that the corporation has already been properly compensated for its unjust enrichment claim.

The rule we adopt is close to the non-exclusive rule in the Delaware statute[14] that a self-dealing transaction may be

---

[14] It is true that Massachusetts has not always followed Delaware law on corporations. Compare Donahue, 328 N.E.2d at 515 & n.17 (creating a new fiduciary duty of utmost good faith and

approved by the consent of all shareholders -- whether interested or not -- so long as there is disclosure to those shareholders of all material facts concerning the self-dealing.[15]  See Del. Code Ann. tit. 8, § 144(a); R. Clark, Corporate Law 168 (1986).  That statutory rule is modified by Delaware case law, but the case law regarding the effect of the fully informed consent of shareholders in various contexts[16] has been described by the Delaware Chancery

_____

loyalty among the stockholders of Massachusetts close corporations that is more exacting than the duty traditionally owed by corporate directors and officers), with Nixon v. Blackwell, 626 A.2d 1366, 1379-81 (Del. 1993) (noting that directors have the same fiduciary duties under Delaware law whether or not a corporation is closely held and declining to fashion "a special judicially-created rule for minority investors" in close corporations).  Massachusetts' independent view expressed in Donahue does not address how the duties imposed on fiduciaries in close corporations might be affected where there is unanimous ratification by informed shareholders.  The applications of fiduciary duties in Donahue and in Demoulas do not involve second-guessing the unanimous decision of informed shareholders, so neither of those cases reaches as far as this case requires.

[15]     Under the Delaware statute, a self-dealing transaction may be approved by the consent of a majority of fully-informed and disinterested directors; by the consent of fully-informed shareholders; or by a showing that "the contract or transaction is fair to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the shareholders."  Del. Code Ann. tit. 8, § 144(a)(3).  Delaware case law suggests that the approval of a majority of informed shareholders is sufficient under the statute, but the cases disagree about whether interested shareholders may be counted towards the majority.

[16]     One commentator has noted the weaknesses of relying on shareholder approval in public corporations to protect investors' interests.  See R. Clark, Corporate Law 180-183 (1986).

-21-

Court as "not a model of clarity." Solomon v. Armstrong, 747 A.2d 1098, 1113 (Del. Ch. 1999).

Here, there was unanimous shareholder approval, so the case does not present the question of what to do where a majority of shareholders approve but that majority is controlled by or composed of the defendants. If fully informed shareholder approval were simply by a majority, then different rules and shifting burdens might apply, see, e.g., Wachsler, Inc. v. Florafax Int'l, Inc., 778 F.2d 547, 552 (10th Cir. 1985), because then, "even an informed shareholder vote may not afford the minority sufficient protection to obviate the judicial oversight role." In re Wheelabrator Techs., Inc. S'holders Litig., 663 A.2d 1194, 1204 (Del. Ch. 1995). That rationale for requiring an additional fairness showing -- the protection of dissenting minority shareholders who, perforce, have brought a derivative action -- is inapplicable where the fully informed shareholder owners of a close corporation, even if interested, unanimously consent to the giving of a release.

As a practical matter, many close corporations are family corporations and/or do not have any disinterested shareholders or disinterested directors. Because the shareholders are the owners, if all of the owners, "interested" or not, of a close corporation agree to allow a release of claims of self-dealing after receiving full information about it, then they have had the opportunity to protect their own interests and there are no dissenting shareholders

-22-

who may need further protection.  It would ordinarily be unwise to involve courts in reviewing the informed and unanimous decisions of the owners, absent special circumstances.

Massachusetts, of course, may choose a different path in the future.  It may, for example, feel that creditors of close corporations deserve protection against the mutual looting of corporate assets by all of a close corporation's shareholders.  The law, however, already provides a degree of such protection.  As the district court aptly recognized, a corporation may not act to release claims when that action would cause the corporation to go into insolvency or would take place during insolvency.  See Mass. Gen. Laws ch. 109A, § 5; In re Tufts Elecs., Inc., 746 F.2d 915, 917 (Mass. App. Ct. 1984) (explaining that "prejudice [to creditors] arises where the transaction is a fraudulent conveyance or one which led to corporate insolvency").

If there has not been adequate disclosure to the remaining Mi-Lor shareholders, then there may be defenses available such as lack of causation or lack of damages, the availability or force of which we need not determine.

## C.  Burden of Proving the Enforceability of the Release

The fact of a release is an affirmative defense, and the party seeking to have a release enforced usually bears the initial burden of pleading and proving the existence of that release.  See

<u>Sharon</u> v. <u>City of Newton</u>, 769 N.E.2d 738, 742-43 (Mass. 2002).  That was done here.

Once the burden of proving the existence of an executed release has been met, the burden of proving or disproving its enforceability may lie with either party, depending on the context in which the release was given.  The defendants argue that the Release is a contract and cannot be nullified absent the plaintiff's proving "fraud, misrepresentation, mutual mistake, breach of fiduciary duty, or undue influence" or "that at the time the release was given the corporation was insolvent or became insolvent as a result of the release."  The last ground for nullification does not apply on the facts here.  As to the other grounds for nullification, the burden of proof is generally on the plaintiff in non-fiduciary duty situations.  <u>See, e.g.</u>, <u>Sharon</u>, 769 N.E.2d at 743 n.6.  The defendants argue that the plaintiffs have the burden on the enforceability issue here.

The defendants' argument ignores the special fiduciary context of the Release:  that the Release goes to a proven breach of fiduciary duty by a corporate officer/director and shareholders.  At least where an underlying claim of breach of fiduciary duty has been proven,[17] we conclude that Massachusetts would place the burden

---

[17]  We need not decide who has the burden of showing enforceability when there is an unadjudicated claim of an underlying breach of fiduciary duty by the corporate fiduciary.  As a federal court sitting in diversity, we prefer to make narrow rulings on issues of state law.  <u>See, e.g.</u>, <u>V. Suarez & Co., Inc.</u>

of showing the enforceability of a release on the corporate fiduciary who relies on that release to extinguish any recovery for the underlying breach. Two doctrines converge to place this burden on the corporate fiduciary. First, Massachusetts adopts the rule that "[a] release executed in favor of one standing in a fiduciary relation to the one executing the release will be subjected to the closest scrutiny by the court." Allen v. Moushegian, 71 N.E.2d 393, 400 (Mass. 1947) (involving a release issued by a client to her attorney). Second, Massachusetts refers to the law of trusts in cases involving corporate fiduciaries, see, e.g., Demoulas, 677 N.E.2d at 171 ("Trust law applies . . . to the management of corporations."), and under trust law, a release of a trustee is "subjected to the closest scrutiny," Akin v. Warner, 63 N.E.2d 566, 570 (Mass. 1945); Restatement (Second) of Trusts § 217(2).

**D. Application of the Standards to the Mi-Lor Release**

The trial court held in an earlier order, on August 17, 2001, that those who executed the Release were not disinterested. The defendants have not argued this issue on appeal, other than simply stating in a footnote that "there was adequate evidence in the record to show . . . that the recipients of the release were disinterested." The issue is waived.[18]

_____

v. Dow Brands, Inc., 337 F.3d 1, 8-9 (1st Cir. 2003).

[18] Even were it not waived, the ruling is fully supportable. A director or officer may be "interested" under Massachusetts law if she is a party to the transaction; has a business, financial, or

Defendants argue that the record establishes that they made full disclosure of all material facts about the Release. There is no formal ruling on this issue, either in the November 20, 2002 memorandum entering judgment for defendants on the Release or elsewhere. Defendants point to the following comment made by the trial judge during a colloquy with counsel on April 20, 2001: "Full disclosure as to what? . . . [T]hey all played the same game. There certainly was full disclosure. Everybody knew that everybody was doing 'it,' whatever it is." This comment is far from a ruling and, in any event, does not foreclose the disclosure issue.

First, the defendants' argument does not logically follow. The fact that Mi-Lor's remaining directors and shareholders also had expenses paid by the corporation means that they were most likely not disinterested, because they benefitted from a practice of corporate largesse. But it certainly does not mean that the Redeeming Principals fully disclosed all material details regarding their own self-dealing.

---

familial relationship with a party to the transaction; has a material pecuniary interest in the transaction; or is subject to a controlling influence by a party to the transaction who has a material pecuniary interest. Harhen v. Brown, 730 N.E.2d 859, 864 & n.5 (Mass. 2000) (adopting the definition of "interested" stated in 1 ALI Principles of Corporate Governance § 1.23 (1994)). A shareholder is "interested" if she is a party to the transaction or is also an interested director or officer. Id. The directors and shareholders who approved the Release had interconnected familial, financial, and business relationships with parties on both sides of the Release.

Second, we cannot say that the record establishes full disclosure, thus resolving the issue. At oral argument, this court asked defendants' counsel to indicate what evidence was in the record to show that the defendants had made full disclosure. Counsel replied that Mi-Lor's bookkeeper had testified that he knew of the details of the unjust enrichment. The bookkeeper's knowledge does not even come close to establishing full disclosure, which must be made to the remaining shareholders.

The plaintiffs, in turn, contend that they are entitled to judgment because the defendants have the burden of proof and did not prove that they made full disclosure of their self-dealing. The argument is premature. No one yet has had the benefit of the full analysis of this issue from the distinguished judge who sat through the trial and has lived with this case for some years. This opinion clarifies the applicable standards and burdens, and whether to accept additional evidence on this or any other matter is an issue for the trial judge. The defendants bear the burden on remand of establishing full disclosure.

Plaintiffs also urge us to hold as a matter of law that the Release was unfair because there was no consideration given for it. They cite cases which they say hold that redemption of stock never benefits a corporation. See In re Roco Corp., 701 F.2d 978 (1st Cir. 1983); In re Main St. Brewing Co., Ltd., 210 B.R. 662 (Bankr. D. Mass. 1997). Those cases do not stand for that

-27-

proposition at all. Instead, Roco essentially says that when a corporation is insolvent on the date it redeems shares of its stock, the corporation receives nothing of value, 701 F.2d at 982, and Main St. Brewing says that stock redemption claims in bankruptcy are subordinated to the claims of creditors, 210 B.R. at 664-65. In March 1990, when Mi-Lor redeemed the stock of the defendants, the company was not insolvent and its stock was not worthless. And the equitable subordination issue in Main St. Brewing is not at all relevant to the fairness of the Release. Furthermore, agreements by a corporation to purchase its own stock are generally enforceable. Winchell, 85 N.E.2d at 317.

There was no finding on fairness by the district judge and the record does not, from our reading of it, readily provide an answer. In theory, the Release could have benefitted both parties. The corporation, for its part, received stock back, which enhanced the value of its remaining shares and which conceivably could have led to some benefit to it; it also received cooperation and non-compete agreements from the defendants, a release from the defendants of claims against it, and miscellaneous benefits. In turn, the corporation paid out $1 million for the redeemed shares and other consideration and gave up claims that, eleven years later, led to a judgment of $380,807.66 (exclusive of interest). It is not clear what the value of the shares was or how to assess the expected value of the unjust enrichment claim at the time the Release was

-28-

signed, given the risks and costs of litigation and other factors. In short, it is better to have the trial court determine this matter on remand. Cf. Lawton v. Nyman, 327 F.3d 30, 51 (1st Cir. 2003).

## III.

In their cross-appeal, the defendants argue that their statutory and constitutional rights were violated when the bankruptcy court sua sponte granted summary judgment to the plaintiffs on the statute of limitations defense in response to the same defendants' motion that the bankruptcy court had denied over two months earlier.

The cross-appeal is close to frivolous. The district court reviewed the bankruptcy court's summary judgment ruling de novo after both a hearing and the completion of discovery and affirmed the bankruptcy court's order. Any deficiency in the sua sponte nature of the bankruptcy court's decision was cured by the district court's de novo review.

## IV.

**Conclusion**

The underlying sum involved here is approximately $380,000, and considerable counsel fees have been spent to this point. We urge the parties to settle this case before the additional costs of further proceedings become a reality.

The decision of the district court that the Release is valid and enforceable is **reversed**; entry of judgment for the

defendants is **vacated**; the decision of the district court on the statute of limitations is **affirmed**; and the case is **remanded** to the district court for further proceedings consistent with this opinion. Costs are awarded to the Creditors Trustees.  So ordered.