# United States Court of Appeals
## For the First Circuit

No. 02-2470

V. SUAREZ & CO., INC.,

Plaintiff, Appellant,

v.

DOW BRANDS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Lynch, Circuit Judge,
Arnold, Senior Circuit Judge,[*]
and Howard, Circuit Judge.

Federico Calaf-Legrand, with whom Horacio R. Subirá, Alejandro
J. Cacho, and Reichard & Calaf, P.S.C. were on brief, for
appellant.

Daniel F. Blonsky, with whom Ronald P. Weil and Aragon,
Burlington, Weil & Crockett, P.A. were on brief, for appellee.

July 21, 2003

---

[*] of the Eighth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**.    This case involves the circumstances under which Puerto Rico Act 75 is intended to protect local dealers from termination of their distribution agreement in market withdrawal situations.

A manufacturer of household cleaning supplies, Dow Brands, sold a product line to another company and, as a result, terminated its relationship with Suarez, the local dealer/distributor of those products in Puerto Rico.  The dealer sued, claiming a violation of Act 75, the Puerto Rico distributorship protection statute.    We hold that the manufacturer's termination of the dealer relationship was with just cause, and we affirm the summary judgment dismissal of the case.

I.

A.  Factual History

The following facts are uncontested by the parties.  V. Suarez & Company, Inc. was a distributor of many household products in Puerto Rico, including over twenty products manufactured by Dow Brands, Inc., such as Fantastik, Glass Plus, Spray 'N Wash, Pine Magic, Janitor in a Drum, Spray 'N Starch, and Wood Plus.  By 1990, its annual sales of Dow products exceeded $4 million.

For whatever reasons,[1] Suarez's sales of Dow products

---

[1] Dow suspected that a large portion of Suarez's sales were due to products that were diverted back to the United States for resale (a practice known as "diversion").  Suarez denies that it assisted or took part in this practice.  To prevent further diversion, Dow increased the wholesale prices of its products to

have decreased every year since 1992.  In May 1995, a consulting company hired by Suarez recommended that it divest itself of several Dow products, and Suarez incorporated this concept into its corporate strategy for 1995 and 1996.  In August 1996, Suarez stopped distributing a number of Dow products.  By early 1998, Suarez distributed only three Dow products, all household cleaners: Fantastik, Glass Plus, and Spray 'N Wash.  At that time, its annual sales of these products were less than $1.1 million, out of total annual sales of more than $312 million.  The Dow products Suarez distributed constituted only 0.35% of Suarez's total business.  In the spring of 1997, Suarez was at least contemplating the idea of divesting itself of the remaining Dow products.  In February 1997, it hired another consulting firm to perform a valuation of the Dow product line in order to "estimate the fair market value of the distribution rights . . . for their possible sale."[2]

On October 27, 1997, Dow entered into an agreement to sell its worldwide consumer products business to S.C. Johnson & Son, Inc.  The sale included the trademarks to, and the rights to produce and sell, the three Dow products Suarez was still distributing in Puerto Rico.  S.C. Johnson did not agree to assume

_____

Suarez.  The parties dispute who is to blame for the products' resulting decline in sales, but the resolution of this dispute is not necessary to decide this case.

[2] Suarez maintains that it ultimately decided against selling the distribution rights, another issue not material to our decision.

any distributorship agreements, including the one with Suarez.[3] During the negotiations, Dow entered into a confidentiality agreement, as is common, which prevented it from disclosing its negotiations with S.C. Johnson until the sale was completed. The sale closed on January 23, 1998. That same day, Dow informed Suarez that it would no longer be able to provide products to Suarez for distribution because Johnson now owned the product line.

B. Procedural History

On April 7, 1999, Suarez filed suit against Dow in a Puerto Rico court. It alleged that Dow violated Act 75, the Puerto Rico distributor protection statute, which prevents acts "detrimental to the established relationship . . . except for just cause." 10 P.R. Laws Ann. § 278a (1997). Dow removed the case to the federal district court on diversity grounds.

On August 30, 2001, after discovery, Dow filed a motion for summary judgment. Dow argued that the sale of its product line to S.C. Johnson constituted just cause for the termination of the distribution relationship with Suarez. On October 23, Suarez responded and filed its own summary judgment motion. On April 22, 2002, the district court granted Dow's motion and dismissed the lawsuit. V. Suarez & Co. v. Dow Brands, Inc., No. 99-1461 (JAG), 2002 U.S. Dist. LEXIS 7880 (D.P.R. Apr. 22, 2002). Suarez timely

---

[3] There is no evidence that Suarez was treated any differently than other Dow distributors.

appealed.

## II.

### A. Standard of Review

We review grants of summary judgment "de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). We review a question of statutory interpretation de novo. Bryson v. Shumway, 308 F.3d 79, 84 (1st Cir. 2002).

### B. Act 75

Act 75 protects distributor contracts:

> [N]o principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause.

10 P.R. Laws. Ann. § 278a. "Just cause" is defined in the statute as "nonperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." 10 P.R. Laws. Ann. § 278(d).

From a plain reading of the statute, it may appear that only action or inaction on the part of the dealer would provide just cause to allow a principal to terminate the relationship. But a plain reading of Act 75 would produce, in some situations, absurd

-5-

and constitutionally suspect results. As a consequence, the courts have filled in other readings.

In Medina & Medina v. Country Pride Foods, Ltd. (Medina I), 825 F.2d 1, 2-3 (1st Cir. 1987) (Breyer, J.), this court addressed a related question about market withdrawal and certified the question to the Puerto Rico Supreme Court. In doing so, we recognized a primary intention of the act. "Law 75 was intended to protect dealers who built up a market, from suppliers who wish to appropriate their established clientele." Id. at 2-3.[4]

This court certified the following question to the Puerto Rico Supreme Court:

> Where there is a contract of indefinite time period, with price and credit terms left open to negotiation, and the parties negotiate in good faith but cannot reach an agreement as to price and credit, does Law 75 prohibit the supplier from unilaterally and completely withdrawing from the market, when the supplier makes no attempt to appropriate the dealer's good will or established

---

[4] The legislative history of Act 75 makes explicit this intent:

> The problem of the dealership system in Puerto Rico has worsened as of late because of the ill-timed action of domestic and foreign manufacturers who, without just cause, terminate their relationship with their representatives and agents in Puerto Rico as soon as the latter have created a favorable market for their products, thus frustrating the legitimate expectations and interests of those who so efficiently carried out their responsibilities.

18 Diario de Sesiones 1531 (1964), cited in Medina & Medina v. Country Pride Foods, Ltd. (Medina II), 22 P.R. Offic. Trans. 172 (1988).

clientele?

Medina I, 825 F.2d at 3.  The Puerto Rico Supreme Court responded by explaining that "market withdrawal" may constitute just cause:

> Act No. 75 of June 24, 1964, does not bar the principal from totally withdrawing from the Puerto Rican market when his action is not aimed at reaping the good will or clientele established by the dealer, and when such withdrawal--which constitutes just cause for terminating the relationship--is due to the fact that the parties have bargained in good faith but have not been able to reach an agreement as to price, credit, or some other essential element of the dealership. In any case, said withdrawal must be preceded by a previous notice term which shall depend on the nature of the franchise, the characteristics of the dealer, and the nature of the pre-termination negotiations.

Medina & Medina v. Country Pride Foods, Ltd. (Medina II), 22 P.R. Offic. Trans. 172 (1988).

Medina II involved an indefinite term contract with price and credit terms left open to negotiation.  After negotiating and reaching an impasse over key terms, the principal unilaterally withdrew from the market.  Medina II, then, could be distinguished on several grounds from our situation.  First, the Puerto Rico Supreme Court in Medina II sought to avoid a holding that there was no just cause under Act 75, because that would have meant an impairment of the parties' ability to change or bargain in good faith over the terms of the contract.  Id.  The present case, by contrast, does not involve withdrawal from the market for such reasons and so does not implicate those interests.  Second, as best can be told, in Medina II there was no continued distribution of

-7-

those products at all in Puerto Rico, and so no risk of unfair usurpation of the customer base and good will the distributor had built up.

In a more recent and more pertinent case, the Puerto Rico Supreme Court further clarified when a market withdrawal constitutes just cause. In <u>Borg Warner International Corp.</u> v. <u>Quasar Co.</u>, 138 P.R. Dec. 60 (1995),[5] the defendant principal, Quasar, stopped selling products to distributors; that business was transferred to a different division as part of a corporate reorganization by the parent company. The other division continued to distribute its goods in Puerto Rico through a chain of retailers and attempted to negotiate in good faith an agreement with plaintiff, but was unable to do so.

In this context, the Puerto Rico Supreme Court made two pertinent rulings. First, it held that a market withdrawal constitutes just cause if the defendant has withdrawn from the market and there was a breakdown in the negotiations over time; it matters not if others continue to sell the product in question. "The issue here is whether any of the defendants, taking advantage of the market created by [the plaintiff], has continued to sell [the product] in Puerto Rico . . . ." The court looked only to the "<u>defendants</u>' business activity" and ignored allegations that the

_____

[5] The English translation of this case has not yet been reported. However, the case has been officially translated, and so we rely on the official but unpublished translation.

product at issue was still being sold in Puerto Rico through other channels. In a footnote, the court also quoted approvingly from a law review article which explained that "just cause" would be satisfied "if a large diversified company . . . sold off all assets required for manufacture of a product line to a third party." S. Antonetti-Zequeira, A Different Opinion About "Just Cause", 58 Rev. Jur. U.P.R. 625, 632 (1989), cited approvingly in Borg Warner, supra.

Second, the court in Borg Warner excused lack of prior notice in some circumstances. The court explained that the "cardinal purpose of the Medina previous notice term is to allow the dealer to . . . prepare for the effects said withdrawal could have on his business operations." In Borg Warner, no notice had been given because the principal did not plan to terminate the relationship; it was the distributor who walked away from negotiations.

Again, there are distinctions between Borg Warner and the present case. Borg Warner could be read as only a variant of Medina II: in both instances the termination of the dealership relationship with plaintiff was occasioned by the failure of good faith negotiations to produce an agreement. But Borg Warner also extended the just cause definition in two senses: it found just cause even when the product line continued to be distributed in Puerto Rico, and it dispensed with prior notice in circumstances

-9-

where the principal's legitimate corporate reasons, totally independent of the plaintiff dealer, made giving notice to the dealer unreasonable.

This case is admittedly different on its facts and not directly controlled by precedent.

C. Analysis

It is uncontested that Suarez had a dealership arrangement with Dow.[6] Once Suarez has shown that the contract was terminated, Dow has the burden of persuasion to show just cause. R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 52 (1st Cir. 1996).

Dow says it has just cause because it has withdrawn from the market and no longer sells the products at all.[7] Suarez has three primary arguments[8] against Dow's showing of just cause.

_____

[6] Act 75 governs all dealer-principal relations. Many cases interpreting Act 75 have focused on the statutory definition of "dealer," which the Puerto Rico Supreme Court has described as "very sketchy." San Juan Mercantile Corp. v. Canadian Transp. Co., 8 P.R. Offic. Trans. 218, 220 (1978); see A.M. Capen's Co. v. Am. Trading & Prod. Corp., 202 F.3d 469, 473-75 & n.8 (1st Cir. 2000) (finding that plaintiff is not a dealer under the meaning of the statute); Euromotion, Inc. v. BMW of N. Am., Inc., 136 F.3d 866, 871 (1st Cir. 1998) (same).

[7] The distribution contract itself sets no term requiring Dow to continue distributing the products to Suarez. Plaintiff's argument by analogy to Puerto Rico law on leases fails.

[8] Suarez also argues the district court erred in not certifying the question to the Puerto Rico Supreme Court. Suarez has waived the argument. Not only did it not ask the district court to certify the question, it asked the district court to enter summary judgment in its favor. We decline the belated invitation

-10-

First, Suarez argues, this is not a market withdrawal because the products continue to be sold in Puerto Rico, albeit not by Dow. Second, there was no negotiation in good faith, as required by Medina II. Third, there was no advance notice to Suarez. We consider these in turn and find none persuasive.

Suarez first argues that it is within the scope of statutory protection that this court identified in Medina I: protection of dealers from the appropriation of their established clientele by suppliers. Suarez says that Dow appropriated its good will and established clientele when it sold its household product line to S.C. Johnson. Because of its efforts in distributing these products in Puerto Rico, plaintiff argues, Dow was able to fetch a higher price for the product line. The district court correctly found that Suarez had not presented evidence that Dow was attempting to take advantage of or profited from the good will and clientele Suarez had developed. Importantly, Suarez does not allege that Dow at any time acted in bad faith.

From Borg Warner, we know that mere continuation of distribution of the product in the market does not mean that the defendant principal did not have just cause. To put it differently, the statute is not necessarily violated if there is an opportunity to trade on the good will built up by the plaintiff. In some senses, this is a stronger case for the defendant than Borg

to certify.

-11-

Warner; here the other entity is unrelated to the defendant, who was the original principal.  With related entities there may be more opportunity for mischief.

Further, the opportunity to trade on good will in this situation is limited.  As in Borg Warner, the new principal supplier, here S.C. Johnson, presumably already has a set of dealers in its distribution network for its products and wishes to use those dealers.  Suarez may have the opportunity to negotiate a distributorship agreement with S.C. Johnson.  Importantly, this is not an instance in which the defendant, here Dow, benefits by substituting itself for its dealer which has built up the brands in the Puerto Rico market.  There is none of the unfairness, caused by a principal and from which the principal benefits, that Act 75 was meant to prevent.  True, S.C. Johnson may hypothetically gain some benefit from Suarez's activity,[9] but that is not the ill that the statute was intended to address.  This case is in sharp distinction to the benefit to principals, unfairly gained, that Act 75 was meant to counter.

A more significant question is raised by Suarez's second argument.  Both Medina II and Borg Warner involve "market withdrawals" occasioned by the failure of plaintiff dealers and the principal (or substituted principal) to come to terms after good

---

[9] It is debatable whether there would be any benefit and, even if so, whether the benefit is fairly attributable to Suarez's activity.  There is no evidence either way.

faith negotiations. The requirement of negotiation in good faith "doubtlessly seeks to prevent unfair practices by a more powerful company and thus protect the dealer who is in a state of defenselessness and who has no 'bargaining power.'" Borg Warner, supra. "[T]he negotiations of the principal will be considered to be made in good faith only if the terms he offers to the dealer are reasonable." Id.

Here, Dow never negotiated with Suarez because there was nothing to negotiate; Dow wished to remove itself from the business of manufacturing and selling these products entirely, including in Puerto Rico. The Puerto Rico Supreme Court has not made explicit whether the negotiation requirement applies in these circumstances. Our conclusion is that the Puerto Rico Supreme Court would not require such prior negotiation. We have several reasons.

Primarily, a requirement of negotiation with the plaintiff dealer in these circumstances would not serve the statute's main interest: prevention of unfair usurpation by the principal of the distributor's hard-won clientele and good will. Further, it would lead to unintended and unfortunate consequences. Such a result would be directly contrary to two stated purposes of the statute: encouraging a level playing field and not creating new power in the dealer. One purpose of the Act is to "level the contractual conditions between two groups." Walborg Corp. v. Superior Court, 104 P.R.R. 258, 265 (1975). In Medina II, the

-13-

Puerto Rico Supreme Court explained that Act 75 should not be construed "in such a way that the dealer would govern -- by imposing his conditions -- the principal's sales policies, or vice versa, with the inevitable loss of the financial and legal autonomy of both." Medina II, supra.

Here, either negotiation would be meaningless or the plaintiff dealer would acquire leverage it would not otherwise possess.[10] This latter effect would create a new imbalance of power, making the entirely legitimate and unrelated corporate interests of the principal in divesting itself of a product line subject to the interests of dealers.[11] To read the Act to require such a result could discourage national and multinational companies

---

[10] There are several sources of dealer leverage in the Act. One is the potential damages in an Act 75 suit, which may include expended costs and the value of the dealer's good will. 10 P.R. Laws Ann. § 278b. Damages under Act 75 would be essentially a hidden cost of the transaction; if multiplied by many dealers' actions, those damages would be particularly difficult to quantify or predict, adding great uncertainty.

In addition, Act 75 permits the dealer to obtain a preliminary injunction to force the defendant principal to continue the dealership relationship. Id. § 278b-1; see Systema de Puerto Rico, Inc. v. Interface Int., Inc., 23 P.R. Offic. Trans. 379 (1989). The statutory provision for preliminary injunctive relief neither specifies nor forbids that the dealer show a likelihood of success on the merits, 10 P.R. Laws Ann. § 278b-1, and the case law appears to be divided on whether there is such a requirement. See Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir. 1984); Cobos Liccia v. DeJean Packing Co., 24 P.R. Offic. Trans. 896 (1989); Systema de Puerto Rico, Inc., supra.

[11] That result is even harder to justify where the plaintiff dealer plays a rather minimal role in the principal's overall distributor network, such as Suarez does here. The Puerto Rico market constituted only 0.14% of Dow's worldwide sales.

from entering into distributorship agreements subject to Act 75 in Puerto Rico.

Further, the Puerto Rico Supreme Court has indicated that it would agree with our reasoning. The Borg Warner court cited with approval the law review article by Antonetti-Zequeira that took the position that Act 75 would not require compensation if a company sold off the ability to manufacture a product as part of a corporate reorganization. Puerto Rico is a civil law jurisdiction and follows the rule of such jurisdictions of heavier reliance on learned commentators than common law jurisdictions. See J.H. Merryman, The Civil Law Tradition 56-57 (2d ed. 1985) ("The civil law is a law of the professors. . . . The common law is still a law of the judges.").

Third, Suarez argues that Dow's withdrawal from the market did not constitute "just cause" because no notice was given. Borg Warner made clear that in some circumstances, notice could be excused. In that case, notice was excused because the principal had no intention of terminating the relationship until the negotiations fell through. Here, Dow knew well in advance that it would be ending the distributorship arrangement with Suarez if it consummated the deal with S.C. Johnson, but due to a confidentiality clause in the purchase agreement it was bound to silence.

We are doubtful that Puerto Rico law would impose any

notice requirement at all for the same reasons there can be market withdrawal in these circumstances without negotiation. Admittedly, a notice requirement, even without a negotiation requirement, is of benefit to the dealer and is arguably less intrusive into the internal corporate affairs of the principal, but it is still a weighty intrusion. Since we sit in diversity, predicting the development of local law, we choose to decide the issue on narrower fact-based grounds.

The purpose of the notice requirement "is to allow the dealer to find out well in advance about the principal's intention to withdraw from the market so that he can prepare for the effects said withdrawal could have on his business operations." Borg Warner, supra. The importance of the notice requirement depends on the relationship between the dealer and the principal:

> The less lines a dealer represents, the greater his reliance on each line he sells, and thus the greater the importance of the previous notice. . . . [T]he termination of a contract that only represents a small fraction of the dealer's business will not seriously throw his business off-balance, hence the importance of the previous notice shall be less.

Id. Also to be considered are "the age of the ties broken by the dealer, the market conditions of the specific commercial sector, and his relationship with other suppliers and with the clientele of the withdrawing product." Medina II, supra.

On the facts here, Suarez cannot establish a notice requirement. When Dow terminated the dealer contract, Suarez's

-16-

annual sales for the three products were less than $1.1 million, out of total annual sales of $312 million; the Dow products constituted about 0.35% of Suarez's total business. Suarez was at one time contemplating abandoning the Dow products altogether. Thus, there was little reliance by Suarez on this line of business, and there was little Suarez could have done to prepare for this termination had it received advance notice from Dow. We find that on these facts, advance notice was not required, and Dow's failure to notify Suarez is not a bar to a finding of just cause for the contract termination.

Suarez's counsel have ably argued their client's cause. Nonetheless, Dow's termination of the dealership relationship with Suarez, precipitated by Dow's sale of the product line, constituted just cause.

### III.

The district court's grant of summary judgment to the defendant is **affirmed**. Costs are awarded to Dow.