MATOSANTOS COMMERCIAL
CORPORATION,
Plaintiff(s)

v.

SCA TISSUE NORTH AMERICA,
LLC, Defendant(s).

Civil No. 02–2661 (JAG).

United States District Court,
D. Puerto Rico.

Sept. 30, 2004.

Hector Saldana–Egozcue, Lino J. Saldana, Saldana, Saldana–Egozcue & Vallecillo, PSC, Santurce, PR, for Plaintiff.

Alberto R. Estrella–Arteaga, Gilberto J. Marxuach–Torros, McConnell Valdes, Henry O. Freese–Souffront, McConnell Valdes, San Juan, PR, for Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

On March 4, 2003, plaintiff Matosantos Commercial Corporation ("MCC") filed an Amended Complaint asserting two causes of action: (1) for breach of a distributorship agreement pursuant to Puerto Rico Dealer's Act, P.R. Laws Ann. 10 §§ 278(e) ("Act 75"), and (2) for damages arising from a cause of action for breach of contract under Articles 1054 and 1059 of the Puerto Rico Civil Code, P.R. Laws Ann. 31 §§ 3018 and 3023 against defendant SCA Tissue NA, LLC ("SCA")(Docket No. 8). On August 4, 2004, SCA filed a second motion for summary judgment (Docket Nos. 105–107).[1] On August 23, 2004, MCC filed its opposition (Docket Nos. 114–116).

1. On August 9, 2004, the Court denied SCA's first motion for summary judgment (Docket No. 109). *See Matosantos Commercial Corp.* *v. SCA Tissue North America, LLC,* 329 F.Supp.2d 255 (D.P.R.2004).

For the reasons discussed below, the Court **DENIES** SCA's second motion for summary judgment.

## FACTUAL BACKGROUND[2]

MCC has had a commercial relationship with Georgia–Pacific Corporation ("GPC") since 1967 which involved MCC's distribution of GPC's "Universal" or "Standard" "away-from-home" commercial tissue products. GPC's "standard" away-from-home commercial tissue products were marketed under the "Coronet", "Verigood", "Delta", "Econoserve", and "Savoy" brand names. On October 4, 1999, Chesapeake Corp. ("Chesapeake"), Wisconsin Tissue Mills, Inc. ("Wisconsin Tissue"), and GPC entered into a Joint Venture Agreement ("JVA") whereby they combined their respective away-from-home commercial tissue businesses under a new entity called Georgia Pacific Tissue Company, LLC ("GP Tissue").[3] Pursuant to the JVA, GPC assigned to GP Tissue, *inter alia*, the agreement which gave MCC distribution rights in Puerto Rico of GPC's "Standard" away-from-home commercial tissue products. In October 1999, GPC's Chris Jones informed Manuel Matosantos Jr., MCC's President, of GP Tissue's creation. On November 12, 1999, GP Tissue notified MCC that its agreement with GPC had been assigned to GP Tissue effective October 4, 1999.

Prior to the JVA, Wisconsin Tissue's products had been sold in Puerto Rico exclusively by Melissa Sales Corp. ("Melissa"). Wisconsin Tissue's products were marketed under the "Second Nature", "Park Avenue", and "Main Street" brand names. MCC did not distribute any of these brands prior to the JVA. MCC was aware of Melissa's relationship with Wisconsin Tissue insofar as it bought Wisconsin Tissue products through Melissa. Pursuant to the JVA, Wisconsin Tissue assigned its contract with Melissa to GP Tissue.

Since the early 1990's, GPC has been engaged in an ongoing product rationalization process throughout the United States whereby products that met certain sales and profitability criteria were kept in the product line while others were discontinued. GPC did not consult MCC or any other distributor prior to discontinuing any products. On April 1, 2000, GP Tissue integrated the former GPC and Wisconsin Tissue product lines into a unified away-from-home commercial tissue products portfolio. Although GP Tissue discontinued certain brands, former GPC brands "Coronet" and "Savoy" survived the product integration process. GP Tissue's product line was grouped into four principal brands: (1) "Park Avenue", (2) "Coronet", (3) "Mainstreet", and (4) "Second Nature". Following the product integration process, MCC purchased from GP Tissue products from the "Park Avenue" and "Mainstreet" brands, while Melissa began to purchase from the "Coronet" and "Savoy" brands for resale in Puerto Rico.

## DISCUSSION

### A. *Summary Judgment Standard*

The court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

**2.** The relevant facts are taken from defendant's statement of uncontroverted material facts (Docket No. 106) inasmuch as they are undisputed by plaintiff.

**3.** GP Tissue has since changed its name to SCA Tissue North America, Inc.

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *See also Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52. (1st Cir.2000).

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented before the court, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine". "Material" means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is "genuine" when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment."

*Id.* at 252. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

### B. SCA's Second Motion for Summary Judgment

SCA seeks summary judgment in its favor arguing that (1) even if MCC could establish that it was GPC's exclusive distributor in Puerto Rico, SCA had "just cause" to sell former GPC commercial tissue products to Melissa as a result of GP Tissue's product integration process; and (2) that Law 75, as applied, violates the Commerce Clause of the U.S. Constitution. The Court will address each argument in turn.

#### 1. Law 75

Law 75 governs the business relationship between principals and the locally appointed distributors who market their products. *See Irvine v. Murad Skin Research Labs., Inc.*, 194 F.3d 313, 317–18 (1st Cir.1999). Law 75 limits the principal's ability to unilaterally end the relationship except for "just cause" once the distributor has developed a local market for the principal's products or services, and while subjecting the dealer to economic hardship. *Caribe Indus. Systems, Inc. v. National Starch and Chemical Co.*, 212

F.3d 26 (1st Cir.2000). "Just cause" under Law 75 is a question of fact. *See La Playa Santa Marina, Inc. v. Chris–Craft Corp.*, 597 F.2d 1, 4 (1st Cir.1979). The "just cause" inquiry, by the statute's plain terms, turns solely on the dealer's actions or omissions. *See* 10 P.R. Laws Ann. § 278. To avoid the constitutional invalidation of the statute, however, the Puerto Rico Supreme Court has held that a principal's own circumstances may permit its unilateral termination of an ongoing dealership, irrespective of the dealer's conduct. *See Medina & Medina v. Country Pride Foods, Ltd.*, 858 F.2d 817, 822–23 (1st Cir. 1988) (responding to a question certified in 825 F.2d 1 (1st Cir.1987)). *Medina & Medina* recognized that courts cannot construe law 75 in such a way that the principal would be subordinated to the dealer. Such an interpretation would be contrary to public order because it would place an unreasonable restriction on a corporation's contractual liberty. *See* 122 D.P.R. at 187–189, 1988 WL 580766. ("[T]he legislative intent was not to turn dealerships into interminable relationships, first of all because such legislative option would raise serious constitutional objections; and, second, because [the] principal and dealer have opposed interests.")

SCA relies upon *Medina & Medina* and *V. Suarez v. Dow Brands, Inc.*, 337 F.3d 1 (1st Cir.2003), to support its contention that it did not violate Law 75 because the product integration process, which was implemented nation-wide and in a non-discriminatory manner, was not meant to reap MCC's goodwill or its clientele. The problem with this argument, however, is that it is not the product integration process which is the crux of this case, but rather how SCA's products are being distributed within Puerto Rico.

MCC is not claiming exclusive distribution rights over all of SCA's product lines; nor is it up in arms over SCA's product integration process. It is over the allegation that the "Coronet" product line, over which it claims exclusive distribution rights in Puerto Rico, is now also being distributed by its competitor, Melissa.[4] The Court sees these as two separate and independent processes which do not necessarily affect each other. SCA could have integrated its product lines into four brands while still distributing the "Coronet" line through MCC and "Park Avenue", "Mainstreet", and "Second Nature" through Melissa. Therefore, SCA has failed to make an argument that would warrant the entry of summary judgment in its favor.

### 2. *The Commerce Clause*

SCA next argues that because the JVA and the product integration process were conducted nationwide, the commerce clause preempts application of Law 75. The Commerce Clause grants Congress the power "[t]o regulate Commerce with foreign nations, and among the several states." U.S. Const. Art. I, § 8, cl.3. Courts have long held that the Commerce Clause applies to Puerto Rico. *See Secretary of Agriculture v. Central Roig Refining Co.*, 338 U.S. 604, 616, 70 S.Ct. 403, 94 L.Ed. 381 (1950); *see also Trailer Marine Transport Corp. v. Rivera Vazquez*, 977 F.2d 1, 6–9 (1st Cir.1992). While the language of the Commerce Clause only speaks of the power of Congress to regulate commerce, it has been interpreted to contain an implicit restraint on state power even in the absence of Congressional action, a notion which has come to be known as the "dormant Commerce Clause." *See*

---

4. MCC also claims that SCA sold its products directly to its customers. At this time, however-

er, the details or circumstances surrounding this fact are unclear to the Court.

*Dennis v. Higgins,* 498 U.S. 439, 446, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991). Thus, the Commerce Clause has been interpreted to limit the ability of the states to interfere with domestic and foreign commerce. "The limits on a State's power to enact substantive legislation are similar to the limits on the jurisdiction of state courts. In either case, 'any attempt "directly" to assert extraterritorial jurisdiction over persons or property would offend sister States and exceed the inherent limits of the State's power.'" *Edgar v. MITE Corp.,* 457 U.S. 624, 643, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)(*quoting Shaffer v. Heitner,* 433 U.S. 186, 197, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)).

■ As discussed above, however, SCA's focus is misplaced. How and by whom its products are distributed within Puerto Rico can hardly be construed as having an effect on interstate commerce. Moreover, SCA has failed to show that distributing the "Coronet" brand through MCC and the rest of its product lines through Melissa would have an effect over its nationwide operations. Accordingly, this argument must also be denied.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** SCA's second motion for summary judgment.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 30th day of September 2004.