**MATOSANTOS COMMERCIAL CORPORATION,**
Plaintiff(s)

v.

**SCA TISSUE NORTH AMERICA, LLC, Defendant(s).**

Civil No. 02–2661 (JAG).

United States District Court, D. Puerto Rico.

May 9, 2005.

Hector Saldana–Egozcue, Lino J. Saldana, Carlos Lugo–Fiol, Santurce, PR, for Plaintiff.

Angel Catillo, Jr., Morgan, Lewis & Bockius, LLP, Miami, FL, Henry O. Freese–Souffront, Raul M. Arias–Marxuach, McConnell Valdes, San Juan, PR, for Defendant.

## MEMORANDUM AND ORDER

GARCIA–GREGORY, District Judge.

Pending before the Court are various motions *in limine* filed by both parties as well as the oppositions and replies thereto. For the reasons discussed below, the Court **GRANTS** defendant's motion to suppress the existence of an indemnity agreement (Docket No. 138); **GRANTS** defendant's motion to suppress plaintiff's expert witness reports (Docket No. 139); **GRANTS in part and DENIES in part** plaintiff's motion in limine (Docket No. 141); and **GRANTS** plaintiff's motion to strike (Docket No. 145).

## DISCUSSION[1]

A. *SCA's motion to suppress the indemnity agreement*

In its motion, SCA Tissue North America, LLC ("SCA") moves to suppress the existence of a defense and indemnity agreement (the "agreement") between itself and Georgia–Pacific Corporation ("GPC"). According to the terms of the agreement, GPC has assumed the costs of SCA's legal defense and may be required to indemnify SCA for any damages awarded in this case. SCA thus argues that the agreement is akin to liability insurance, evidence of which is inadmissible at trial pursuant to Fed.R.Evid. 411. In the alternative, SCA argues that the agreement should be suppressed as it is irrelevant and prejudicial pursuant to Fed.R.Evid. 401 and 403.

Rule 411 states that

Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership or control, or bias or prejudice of a witness.

The rationale behind the rule is the potential prejudice of the jury by the knowledge that the defendant is insured. "Courts fear that the jury's knowledge of insurance might cause it to assume that any verdict which it renders against the defendant will be paid by a wealthy and impersonal insurance company." 4 Rowland H. Long, *The Law of Liability Insurance*, § 25.04 (2004). "[S]uch evidence is excluded as being an invitation to the jury to share the resources of the insurer with the plaintiff, regardless of the merits of the case." 1 Michael H. Graham, *Handbook of Federal Evidence*, § 411.1 (5th Ed.2001).

It remains undecided, however, whether an indemnity agreement like the one at issue here is considered liability insurance for purposes of Fed.R.Evid. 411. One court has rejected such an application of the Rule by reasoning that the indemnity agreement does not possess all the characteristics traditionally attributable to liability insurance; i.e., insurer did not spread risk among policy holders, contract was an isolated business transaction, and parties had not insured against future risk, but rather against past conduct. *See DSC Communications Corp. v. Next Level Communications*, 929 F.Supp. 239, 243–245 (E.D.Tex.1996). Meanwhile, others

---

1. The facts are set forth in the Court's previous opinions in this matter (Docket Nos. 83, 109, 144). *See* 2004 WL 1778279 (D.P.R. June 21, 2004)(unpublished); 329 F.Supp.2d 255 (D.P.R.2004); 340 F.Supp.2d 109 (D.P.R. 2004).

have found that indemnity agreements and fidelity bonds bear no significant differences from liability insurance. *See Griffin v. Hilke,* 804 F.2d 1052, 1058 (8th Cir. 1986); *Garnac Grain Co. v. Blackley,* 932 F.2d 1563 (8th Cir.1991).

■ In this case, the Court is inclined to disagree with the decision in *DSC Communications.* First, in *DSC Communications,* the indemnity agreement was signed after the defendant had engaged in the conduct giving rise to liability, a condition that is not present here. Here, the indemnity agreement was signed before the alleged breach of MCC's exclusivity, as part of the Securities Purchase Agreement whereby GPC sold part of its away-from-home tissue business to Svenska Cellulosa Akiebolaget, now known as SCA. Thus, it was meant to "insure" or protect SCA against possible future risk, as does liability insurance.

And second, the Court disagrees with *DSC Communications'* conclusion that because the "insurer" there was not normally engaged in the business of insurance, but was rather entering into a one-time business transaction, and because it did not spread the loss among policyholders the indemnity agreement could not be considered a liability insurance. The fact that the "insurer" is not an insurance company should not preclude Rule 411's protection when an indemnity agreement serves the same purpose as liability insurance. For

the insured, the effect is the same, that a third party will pay or reimburse for any damages if liability is found. Moreover, in the eyes of the jury the fact remains that a third party, be it an insurance company or another corporation, will bear the damages instead of the defendant. Therefore, the Court finds that the rationale behind Fed. R.Evid. 411 will be best served by suppressing at trial evidence of the indemnity agreement between SCA and GPC.[2] Because plaintiff has not proffered that it would present the existence of the agreement for another purpose as allowed by Fed.R.Evid. 411, it must be suppressed.

■ Even if the agreement were admissible pursuant to Fed.R.Evid. 411, the Court would nevertheless exclude the agreement because it is irrelevant to the controversy at hand. Pursuant to Fed. R.Evid. 401, " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MCC purports to introduce the agreement into evidence "to show the relationship between GPC and SCA and the conditions upon which the lines of products distributed by MCC changed from one company to another" and "because this may affect the credibility of defendant and its witnesses...." (Docket No. 172 at 3).

2. Some commentators have also questioned whether the term "person" as used in Fed. R.Evid. 411 is applicable to large corporations such as SCA.

> [T]he view appears to be that where the party is an entity with significant financial resources, the jury is already likely to exercise unfair prejudice against the party on the basis of its wealth, and the fact that the party is insured will not add greatly to the existing danger of a decision on an improper basis.

David P. Leonard, *Selected Rules of Limited Admissibility,* The New Wigmore § 6.7.2 (2001 Supp.)(footnotes omitted). Although the risk that the jury will base its decision upon an improper basis is certainly smaller, excluding large corporations or entities from Rule 411's ambit could lead to chaotic consequences as each judge is forced to apply the rules subjectively based on a company's wealth.

The Court, however, fails to envision how the existence of an indemnity agreement will affect the credibility of any witness, or why it is necessary to show the relationship between the corporations. Certainly MCC can establish the relationship that exists between GPC and SCA and how the lines of products were transferred from one to the other without reference to the indemnity agreement. The issue here is the impairment of an exclusive dealership and reference to the indemnity agreement will not make it more or less probable that the impairment indeed occurred or even aid in establishing the reasons why the exclusivity was terminated. Thus, the agreement must be excluded as irrelevant pursuant to Fed. R.Evid. 401.

### B. SCA's Motion to Suppress MCC's Expert Witness Reports

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court asserted that courts perform a gatekeeping role in regulating the admission of expert testimony under Fed.R.Evid. 702. The proffered expert testimony is evaluated for both reliability and relevance. *Daubert* at 591–595, 113 S.Ct. 2786. The review for reliability takes into consideration several factors; the verifiability of the expert's theory or technique, the error rate inherent therein, whether the theory or technique has been published and/or subjected to peer review, and its level of acceptance within the scientific community. *Daubert* at 589–595, 113 S.Ct. 2786. As to relevance, "expert testimony must be relevant not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz–Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir.1998)(*citing Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786). In exercising its gatekeeping function, the Court need not follow any particular procedure. *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir.2002)(*citing Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

### 1. The June 17 Report

In its motion, SCA seeks suppression of two expert witness reports issued by CPA Diego Chevere ("Chevere") detailing the alleged damages suffered by MCC. In the first report, dated June 17, 2004 (the "June 17 Report"), Chevere applied the formula provided in article 3(d) of Law 75 for an estimate of the damages allegedly suffered by MCC.

> If no just cause exists for the termination of the dealer's contract for detriment to the established relationship ... the principal shall have executed a tortious act against the dealer and shall indemnify it to the extent of the damages caused him, the amount of such indemnity to be fixed on the basis of the following factors:
>
> (a) ...
>
> (d) The amount of the profit obtained in the distribution of the merchandise or in the rendering of services, as the case may be, during the last five years....

P.R. Laws Ann. 10 § 278b. Using this formula, Chevere arrived at the figure of $707,545.00 as the damages suffered by MCC as a result of the alleged breach.

SCA argues that the formula provided in article 3(d) is better suited to cases where the dealership contract has been terminated rather than where, as here, the relationship has merely been impaired. The reasoning is that in a termination case the dealer is completely severed from the product line and, if no just cause is found,

it would be entitled to the full profits it could have realized had it continued selling the product. In an impairment case, however, the amount of damages would be offset by profits realized from continuing sales of the product and the dealer should only be awarded the profits actually lost by the increased competition rather than the full potential amount. *See, e.g., Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 961 F.Supp. 353, 360–361 (D.P.R.1997).

Two different judges within this District have already faced similar questions in impairment cases under Law 75 and both have decided that article 3(d) should not be automatically applied to impairment cases. *See Casas,* 961 F.Supp. at 353; *A.M. Capen's Co. v. Am. Trading and Prod. Corp.,* 973 F.Supp. 247 (D.P.R.1997) *rev'd* on other grounds by 202 F.3d 469 (1st Cir.2000). Although MCC argues that the Court should not follow *Casas* and *A.M. Capen's* because they have not been reviewed and upheld by the appellate courts,[3] the reasoning in those cases is highly persuasive and is in tune with the Puerto Rico Supreme Court's interpretation of how Law 75's article 3 is to be applied.

In *Marina Industrial v. Brown Bovery,* 14 P.R. Offic. Trans. 86, 114 D.P.R. 64 (1983), the Puerto Rico Supreme Court decided that

> [t]he factors listed [in article 3] were only guidelines for the fixing of the damages and do not bind the court to automatically award indemnity applying each and every factor. The court has the discretion to apply the factors listed in [ ] light of the specific circumstances of

each case, pursuant to the evidence presented. Of course, the indemnity can never have punitive character because, as it is known, said type of damages do not exist in this jurisdiction.

*Id.* at 118, 114 D.P.R. at 90. Thus, article 3 is not a mandatory formula for determination of damages, but is rather meant to function as a guide for the Court as to which factors can and should be considered. MCC argues, however, that while the Supreme Court's ruling does allow the courts to decide which of the factors to apply in each case, they are still bound to apply one of the factors listed therein and cannot fashion a remedy different from those listed. The Court disagrees.

■ The *Marina Industrial* opinion made it clear that the factors would be applied "in [ ] light of the specific circumstances of each case...." *Id.* The Court has the discretion then, not only on which factors to apply, but also on how those factors are to be applied "pursuant to the evidence presented." *Id.* The circumstances of this case simply do not support the inflexible application of article 3(d). MCC has continued sales of SCA's away-from-home products, albeit with increased competition, and has derived profits from those sales.[4] Thus, MCC cannot be entitled to the full amount of possible damages when it has continued making a profit selling SCA's products. If the court were to blindly apply article 3(d) without consideration of MCC's post-breach profits, the result would be an award meant to punish SCA, which is forbidden by Puerto Rico law, rather than an award meant to com-

---

3. Obviously MCC did not see the First Circuit's opinion in *A.M. Capen's Co., Inc. v. American Trading and Production Corp.,* 202 F.3d 469 (1st Cir.2000), during its research.

4. In fact, soon after the alleged breach MCC also began distributing other SCA product

lines over which its competitors previously claimed exclusivity. Profits on these product lines, however, should not be factored to offset MCC's post-breach loss of profits because the issue here is only the losses related to the Savoy and Coronet product lines.

pensate MCC for the actual damages it suffered, the objective behind Law 75. *See Draft–Line Corp. v. Hon Co.*, 781 F.Supp. 841, 847 (D.P.R.1991)("To view any part of [article 3] as an automatic provision would be the equivalent of reading a punitive damages provision into the statute, violating the policy of the Puerto Rico Civil Code against punitive damages.").

Therefore, insofar as it overstates the actual damages suffered by MCC by not accounting for their realized profits, the June 17 report must be excluded.[5]

### 2. *The June 22 Report*

■ In his second report dated June 22, 2004 (the "June 22 Report"), Chevere makes a determination of MCC's lost profits as a result of the breach in support of its claim for breach of contract pursuant to the Puerto Rico Civil Code, P.R. Laws Ann. 31 §§ 3018 & 3023. SCA seeks preclusion of this second report because it is premised upon the assumption that MCC would have made one-hundred percent of the sales of SCA's products to other distributors in Puerto Rico and there is no factual basis to support such an assumption. MCC counters by arguing that the June 22 Report finds support in the market demand for Savoy and Coronet products which would have been channeled through MCC but for SCA's breach of its exclusivity.

However, "even in infringement cases, it would definitely be speculative to presume, without sufficient and valid proof to substantiate such an assumption, that all the sales made by the other dealers would have been made by the plaintiff." *Casas*, 961 F.Supp. at 361. Chevere impermissibly assumed without proper justification that all the products bought by distribu-

tors other than MCC would have been sold through MCC, thus entitling it to the full amount of profits made on those products. There is simply no evidence on the record to support such a claim. In fact, Chevere admitted in his deposition testimony that he did not verify whether any of those distributors had bought from MCC in the past. (Docket No. 139, Exh. A, pp. 79–80). Furthermore, there is evidence that the only one of them to have done so did not buy products manufactured by SCA. (Docket No. 139, Exh. C, p. 44). Accordingly, because it lacks a proper factual foundation, the June 22 Report must also be precluded.

### C. *MCC's Motion in Limine*

In its motion MCC seeks preclusion of several letters exchanged between counsel in what seems like an effort to prevent this litigation and the preclusion of SCA's expert witness report. The Court will address each in turn.

### 1. *The Letters Exchanged Between Counsel*

MCC seeks preclusion of seven letters exchanged between its counsel and SCA's counsel during the months of December 2001 and March 2002. MCC argues that the letters are inadmissible pursuant to Fed.R.Evid. 408 because therein a possible novation of the distribution agreement between the parties is discussed. Thus, the letters were exchanged in the course of a negotiation between the parties which could have avoided this litigation and constitute offers of compromise. SCA opposes by arguing that MCC waived its objection to the letters' admissibility by listing them among its evidence in pre-discovery

---

**5.** Because of this result, the Court need not reach the argument of whether Chevere's cal-culations of MCC's goodwill were also overstated.

disclosures and that the letters are not covered by Fed.R.Evid. 408.

Rule 408 states that

[e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible.

"A primary reason for excluding evidence of a compromise is to encourage non-litigious solutions to disputes. Admission of evidence of the settlement could work to discourage plaintiffs and defendants from settling with one or more of several codefendants." *Reichenbach v. Smith,* 528 F.2d 1072, 1074 (5th Cir.1976).

■ SCA first attempts to persuade the Court that MCC's inclusion of the letters in their initial disclosures is evidence that it intended to use them in support of its case. SCA relies upon *Eisenberg v. University of New Mexico,* 936 F.2d 1131, 1134 (10th Cir.1991), for the proposition that once a party submits a document into evidence it cannot then object its admissibility under Fed.R.Evid. 408. In this case, however, MCC has not submitted these letters into evidence. It merely listed them as potential evidence in mandatory disclosures made at the beginning of discovery. These acts by MCC cannot be understood as evincing an intent to waive the protection provided by Fed.R.Evid. 408.

■ SCA next argues that the letters are not covered by Fed.R.Evid. 408 because they are the product of business communications between the parties at a time before the threat of litigation arose.

Furthermore, the letters do not make reference to an offer or attempt to compromise and do not contain language that could be used to disprove the validity or invalidity of MCC's claims. The Court, however, disagrees with SCA's interpretation of the letters.

It is evident from the letters that the negotiations between the parties were meant to appease MCC's discontent with the loss of its exclusivity on the Savoy and Coronet product lines. MCC did mention on its counsel's letters that it believed to have a valid Law 75 claim against SCA and proposed the terms of the agreement that would cause it to desist from filing suit. Specifically, MCC stated that SCA was in violation of its exclusive distribution rights and that, if an agreement was reached, it was "willing to waive whatever causes of action it might have against SCA." (Docket No. 141, Exh. III). In its response letters, SCA stated its terms for a continuing relationship between the two corporations and set forth its understanding that its acts did not give rise to a Law 75 action. Clearly these were not merely business communications but rather compromise negotiations meant to avoid litigation and, contrary to SCA's assertion, the threat of litigation was latent.

■ SCA further argues that the letters are admissible because they are not proffered to prove liability for or invalidity of MCC's claims. At the very least it requests that the letters from its own counsel be admitted into evidence as they do not make reference to an attempt by MCC to reach a compromise and do not contain language that could be used for an impermissible purpose under Fed.R.Evid. 408. But, although it claims it will not use the letters to invalidate MCC's claims, SCA then proffers that it will use them to show that MCC's extrajudicial demands are inconsistent with its claims in these proceed-

ings. SCA also intends to use the letters to support its argument that MCC's claims are time-barred. The arguments are without merit.

First, the Court has already denied SCA's argument that the complaint is time-barred (Docket No. 109) and will not revisit the issue here or at trial. Second, SCA's intended use of the letters to show an inconsistency in MCC's claims seems an attempt to invalidate MCC's claims, which is not allowed by Fed.R.Evid. 408. Even if only the letters from SCA's counsel were admitted, the communications made during the compromise negotiations would still be reaching the jury for an impermissible purpose as they respond to the statements made by MCC's counsel's in his letters.

Therefore, the letters at issue here are inadmissible at trial.

## B. *SCA's Expert Witness Report*

■ MCC seeks preclusion of the report prepared by SCA's expert witness, CPA Reynaldo Landa ("Landa"), arguing that it is not supported by sufficient facts, that Landa did not verify MCC's books and expense records, and that he did not apply a reliable method of verification of MCC's expenses. The issue arises from Landa's deduction from the gross sales of the Coronet and Savoy products all expenses directly related to their distribution as well as 3.30%[6] of all indirect and fixed expenses incurred by MCC in its business operations. MCC argues that Landa did not audit its books in order to determine the proper amount of those expenses that is actually related to the Coronet and Savoy product lines.

The Court finds, however, that Landa's report is sufficiently supported by the record and its methodology sufficiently reli-

able that it may be presented to the jury. Whether it accurately reflects the damages suffered by MCC is for the jury to decide. Therefore, MCC's motion *in limine* as to SCA's expert witness report must be denied.

## D. *MCC's Motion to Strike*

Through its motion to strike MCC seeks preclusion of two of SCA's proposed exhibits for use at trial. The two exhibits at issue contain the volume of purchases by MCC of GPC products between 2001 and 2004 as well as detailed descriptions of those products, including SKU numbers, brands, and sales volume. MCC objects to these exhibits because they are "trade secrets" which disclosure could cause it harm and because they were not obtained through normal discovery channels, but rather SCA's counsel obtained the documents directly from GPC because it is also represented by the same attorneys. MCC further argues that this constitutes improper conduct on the part of SCA's counsel for which sanctions should be imposed.

SCA counters by arguing that because a Joint Defense Agreement ("JDA") exists between SCA and GPC, these two corporations are bound to cooperate with each other in the defense of this case. Thus, there was no misconduct in GPC making the documents available to SCA and its counsel, especially since MCC had failed to produce them when requested by SCA during discovery proceedings. Furthermore, SCA argues that the sales data does not constitute "trade secrets".

■ Although the Court is at first inclined to deny MCC's motion, it will grant the motion instead, but not on the basis of any of the argument's proffered by MCC. First, it is not entirely clear how the

---

**6.** This is the percentage which the Savoy and Coronet lines constitute of MCC's total sales as determined by MCC's expert witness Mr. Chevere.

MCC's sales volumes fall under the generally accepted definition of a "trade secret" [7] even if MCC is certainly entitled to their confidentiality. And Second, the Court finds no wrongdoing in how SCA came upon the documents. Even though GPC and SCA are competitors, they both signed the JDA as part of GPC's sale of away-from-home products to SCA. Thus, GPC is obligated under the terms of the JDA to assist SCA in its defense in this case.

■ Nevertheless, it is because of SCA's intended use of the exhibits that the Court will grant MCC's motion. SCA states that it intends to use the documents in relation to MCC's purported damages and its failure to mitigate them as well as to undermine the credibility of MCC's expert witness' credibility for his failure to account for MCC's continuing business in GPC's products. The Court having precluded Chevere's reports, SCA does not need the exhibits for that purpose. Furthermore, the issue here is the impairment of MCC's exclusivity over SCA's Coronet and Savoy product lines. MCC's continuing business with GPC is irrelevant to this issue and could be prejudicial to MCC. The admission of evidence of plaintiff's continuing sales of other products not at issue in the case for the purpose of contesting the plaintiff's alleged damages would clearly contradict the rationale behind Law 75. Accordingly, MCC's motion to strike must be granted.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant's motion to suppress the existence of an indemnity agreement (Docket No. 138); **GRANTS** defendant's motion to suppress plaintiff's expert witness reports (Docket No. 139); **GRANTS in part and DENIES in part** plaintiff's motion in limine (Docket No. 141); and **GRANTS** plaintiff's motion to strike (Docket No. 145).

IT IS SO ORDERED.

---

7. Trade Secret—A formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors; information-including a formula, pattern, compilation, program, device, method, technique, or process—that (1) derives independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosures or use, and (2) is the subject of reasonable efforts, under the circumstances, to maintain its secrecy. *Black's Law Dictionary* 1533 (8th ed.2004)